# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 14, 2022       Decided August 5, 2022

No. 19-1236

KENTUCKY MUNICIPAL ENERGY AGENCY, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

KENTUCKY UTILITIES COMPANY AND LOUISVILLE GAS AND
ELECTRIC COMPANY,
INTERVENORS

———

Consolidated with 19-1237, 20-1282, 20-1326, 20-1452,
20-1459, 21-1013, 21-1025

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Latif M. Nurani* argued the cause for municipal petitioners. With him on the briefs were *Thomas C. Trauger* and *David E. Pomper.*

*Paul D. Clement* argued the cause for petitioners Louisville Gas and Electric Company and Kentucky Utilities Company. With him on the briefs were *Erin E. Murphy* and *Julie M.K. Siegal.*

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: HENDERSON, TATEL[*], and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In 1998, the Federal Energy Regulatory Commission approved the merger of two electrical grid operators, Louisville Gas & Electric Company and Kentucky Utilities Company. To protect customers from the merger's potential anticompetitive effects, the Commission required the combined company (collectively, "Louisville Utilities") to join a then-new regional electrical grid organization, the Midwest Independent Transmission System Operator, Inc. ("MISO"). MISO would act like a free trade zone, allowing customers to buy power from generators across the region without having to pay multiple grid operators redundant fees to transmit electricity. By removing those redundant charges—known as "pancaked rates"—MISO membership would give Louisville Utilities customers access to more options for buying competitively priced power.

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

In 2006, the Commission granted Louisville Utilities' request to leave MISO on the condition that it continue to depancake rates for a group of municipal customers in its wholesale market. Louisville Utilities complied with the Commission's order through an agreement called Schedule 402.

Twelve years later, Louisville Utilities asked the Commission to end its depancaking responsibilities under Schedule 402. Most of the customers protected by Schedule 402 objected.

The Commission largely approved the request on the ground that sufficient competition in electricity sales existed to provide Louisville Utilities customers alternative competitive sources for electricity even without depancaking. The Commission ended its analysis there without considering other effects of the modified merger order, like increased prices.

At the same time, the Commission took steps to protect customers that had reasonably relied on depancaking under Schedule 402 in their contracting and investing decisions.

A group of customers previously protected by Schedule 402 (collectively, "Municipal Customers") and Louisville Utilities both have petitioned for review of the Commission's orders. Municipal Customers argue that the Commission should not have greenlit the end of depancaking and that it insufficiently protected customers' reliance interests. Taking a different view, Louisville Utilities argues that the Commission's remedy to shield customers from the end of depancaking was impermissibly broad.

We vacate the Commission's decision to end depancaking under Schedule 402. While the Commission adequately supported its conclusion that customers would continue to

enjoy a competitive market without depancaking, it was arbitrary for the agency to completely ignore the significant effect that duplicative charges would have on customer rates. We also conclude that the Commission's decisions protecting reliance interests were reasonable, with two exceptions.

As a result, we grant the petitions for review in part and vacate and remand the challenged orders in part.

**I**

**A**

**1**

The Federal Power Act tasks the Federal Energy Regulatory Commission with regulating the sale and transmission of wholesale electricity in interstate commerce. *See* 16 U.S.C. § 824; *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 264 (2016). Under Section 203 of the Act, public utilities must seek Commission approval for certain mergers to ensure that they are "consistent with the public interest[.]" 16 U.S.C. § 824b(a)(1), (4).

When deciding if a merger is in the public interest, the Commission considers "both the preservation of economic competition * * * and the various policies reflected in the statutes specific to energy regulation." *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1115 (D.C. Cir. 2001) (citation omitted). The main goal of the Federal Power Act is "to encourage the orderly development of plentiful supplies of electricity * * * at reasonable prices." *Id.* (quoting *NAACP v. Federal Power Comm'n*, 425 U.S. 662, 670 (1976)).

Under Section 203(b), the Commission may condition its approval of utility mergers on "such terms and conditions as it

finds necessary or appropriate to secure" the public interest. 16 U.S.C. § 824b(b). The agency also has the power to adjust merger conditions "from time to time for good cause * * * as it may find necessary or appropriate" and to ensure they are consistent with the public interest. *Id.*; *see Westar Energy, Inc.*, 164 FERC ¶ 61060, ¶ 15 (2018); *see also id*. at ¶ 15 n.24.

**2**

At the turn of this century, the Commission issued a series of orders to make electricity markets more competitive by providing wholesale buyers greater access to competing power plants. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 682, 699 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

As part of its reforms, the Commission addressed a barrier to competition known as "rate pancaking." *Wabash Valley Power Ass'n*, 268 F.3d at 1116. Grid operators typically charge fees to ferry electricity to a neighboring transmission network, like a state levying tolls to drive on its highways. When an electricity customer wishes to buy power from a plant located on another grid it may face pancaked rates—transmission fees "stacked on top of one another[,]" *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 844 (6th Cir. 2021), "much like the total tolls paid when driving on a route that includes both the Pennsylvania and New Jersey turnpikes[,]" *Wabash Valley Power Ass'n*, 268 F.3d at 1116. The Commission has concluded that pancaked rates weaken competition by making it more expensive for customers to buy power from generators on other grids. *See Louisville Gas*, 988 F.3d at 844; *see also* Regional Transmission Orgs., 65 Fed. Reg. 810, 915 (Jan. 6, 2000).

In part to reduce rate pancaking, the Commission prodded utilities to band together to form organizations known as

independent system operators or regional transmission organizations. These independent entities run grids on behalf of grid owners and charge customers standardized, non-duplicative fees to transmit electricity across their network. *See Louisville Gas*, 988 F.3d at 844; *Midwest Indep. Transmission Sys. Operator, Inc.*, 104 FERC ¶ 61105, ¶ 29 (2003).

In light of those reforms, the Commission overhauled its approach to reviewing electricity mergers under Section 203. In 1996, the Commission announced that it would analyze whether a proposed merger is in the public interest by "generally" considering its effect on three factors— competition, rates, and regulation. *See* Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act, Policy Statement, 61 Fed. Reg. 68,595, 68,596 (Dec. 30, 1996) ("Merger Statement"); *see also id.* at 68,597; 18 C.F.R. § 2.26.

On the competition factor, the Commission assesses whether the merger will significantly increase concentration in any market. *See* Merger Statement, 61 Fed. Reg. at 68,596. To do this, the Commission requires merging parties to identify products they each sell, customers that might be affected by the merger, and other suppliers that can compete to serve those customers. *See id.* at 68,600–68,601. The merging parties identify potential rivals by analyzing how much it would cost alternative suppliers to generate electricity and get it to customers and whether suppliers can physically access enough transmission capacity to deliver the energy. *Id.* at 68,601. The agency considers a generator a potential competitor to the merging parties if it can deliver the electricity to a relevant customer at a price that is no more than five percent above the market rate. *See id.* at 68,607 & n.6; *see also* 18 C.F.R. § 33.3(c)(4).

If a merger is projected to significantly increase a market's concentration, the agency will investigate its competitive effects more closely. Merger Statement, 61 Fed. Reg. at 68,608; *cf. United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963). Applicants may mitigate competitive harms to some degree by joining an independent operator that can allow more power plants to compete and reduce market concentration by preventing rate pancaking. *See* Merger Statement, 61 Fed. Reg. at 68,601; *see also id.* at 68,609–68,610, 68,616.

As for the second prong of its public-interest test, the Commission analyzes whether the merging parties have taken sufficient steps to ensure that the merger will not increase customers' rates. *See* Merger Statement, 61 Fed. Reg. at 68,603. Applicants "bear[] the burden of proof to demonstrate that the[ir] customer[s] will be protected" from rate hikes. *Id.* So the agency requires applicants to propose "ratepayer protection mechanisms" in case the transaction's "expected benefits do not materialize." *Id.*

The third factor, which assesses how a merger will affect the relationship between the Commission's regulatory jurisdiction and that of state authorities, is not at issue in this case.

**B**

**1**

In 1997, two utilities in Kentucky, Louisville Gas & Electric Company and Kentucky Utilities Company, sought Commission approval to merge. *See Louisville Gas and Elec. Co.*, 82 FERC ¶ 61308, at 2 (1998) ("*1998 Merger Order*") (Joint Appendix ("J.A.") 2). Each company owned power plants and operated its own electrical grid. Kentucky Utilities

Company also sold wholesale power to twelve cities in Kentucky on a long-term basis. *Id.* at 3–4 & n.7 (J.A. 3–4).[1]

The Commission found that, by removing Louisville Gas & Electric as a rival, the merger would substantially increase concentration in the wholesale energy market faced by Kentucky Utilities Company's long-term municipal customers. *See 1998 Merger Order*, at 15 (J.A. 15). The Commission nevertheless concluded that this factor did not weigh against merger approval, in part because it required the merging parties to join MISO, an independent grid operator. *See id.* at 19 (J.A. 19). That would benefit the municipal customers because MISO would eliminate pancaked rates on its grid, giving them a wider range of power plants from which to purchase electricity at competitive rates. *Id.* The Commission said that if the merged company tried to leave MISO, the agency would "evaluate that request in light of its impact on competition" in the market faced by Kentucky Utilities Company's long-term wholesale power customers. *Id.* (In this opinion, we refer to this group as Louisville Utilities' wholesale customers).

The Commission then turned to the merger's effects on rates. It found that the merging parties' proposed ratepayer protections—which included a commitment to pass along

---

[1] These customers were the Kentucky cities of Barbourville, Bardstown, Bardwell, Benham, Berea College, Corbin, Falmouth, Frankfort, Madisonville, Nicholasville, Paris, and Providence. *See 1998 Merger Order*, at 3–4 n.7 (J.A. 3–4). The Commission referred to these cities as "requirements customers[,]" *id.* at 3 (J.A. 3), which means that Kentucky Utilities Company generally "under[took] a relatively open-ended commitment to provide" them enough electricity to meet their needs. Regulation of Electricity Sales-for-Resale and Transmission Service, 50 Fed. Reg. 23,445, 23,446 (June 4, 1985).

merger-related savings and hold certain customer rates steady for five years—were adequate. *See 1998 Merger Order*, at 20–21 (J.A. 20–21).

**2**

Seven years after the merger, the combined company, Louisville Utilities, sought the Commission's permission to exit MISO. *See Louisville Gas & Elec. Co.*, 114 FERC ¶ 61282, ¶ 1 (2006) ("*2006 Withdrawal Order*") (J.A. 88–89).

Several of Louisville Utilities' wholesale customers, as well as other municipalities on the utility's grid or seeking to join it, opposed the request. Some of them were particularly concerned that if Louisville Utilities left MISO, they would face higher, pancaked rates when purchasing power from MISO. *See Louisville Gas*, 988 F.3d at 845.

Among those opposing Louisville Utilities' request were two Kentucky municipal agencies, the Electric Plant Board of the City of Paducah and the Electric Plant Board of the City of Princeton. These cities had a dog in the fight because both had decided, in late 2004 and early 2005, to leave their prior grid and connect to Louisville Utilities' transmission lines. In 2005, Paducah and Princeton created the Kentucky Municipal Power Agency to secure electricity by investing in Prairie State, a new coal plant to be connected to the MISO grid. (In this opinion, we generally refer to Princeton, Paducah, and Kentucky Municipal Power Agency together as "P&P.") According to P&P's consultant at the time, the Prairie State investment was, "in effect, an option agreement[,]" giving P&P the "right, but not the obligation," to buy a five percent stake in the Prairie State project. J.A. 1236 (Affidavit of Brown D. Thornton).

If Louisville Utilities left MISO, P&P and several other municipalities would face the prospect of paying pancaked rates to obtain power from that grid. So they negotiated with Louisville Utilities to avoid those charges. Louisville Utilities, recognizing that it was "counter-intuitive at [that] time to contemplate that [the Commission] would permit [it] to establish new rate pancakes[,]" agreed not to charge these customers duplicative rates for electricity shipped to or from MISO, so long as MISO did the same in return. J.A. 451 (February 2006 Term Sheet § 1); *see also 2006 Withdrawal Order* ¶¶ 99–100 (J.A. 125–126). In exchange, the municipalities agreed to withdraw their challenge to Louisville Utilities' exit from MISO. J.A. 455 (February 2006 Term Sheet § 7); *2006 Withdrawal Order* ¶ 16 (J.A. 95).

The following month, the Commission allowed Louisville Utilities to leave MISO, subject to one condition relevant here. *See 2006 Withdrawal Order* ¶ 4 (J.A. 90). Louisville Utilities' depancaking proposal depended on MISO agreeing to reciprocally depancake its own charges. But the Commission was concerned that MISO might not do so, leaving Louisville Utilities' wholesale customers stuck paying pancaked rates. *See id.* ¶ 111 (J.A. 129–130). So the Commission directed Louisville Utilities to "shield" its wholesale customers from "any re-pancaking of rates" for power shipments between its grid and MISO, no matter what MISO chose to do. *Id.* ¶¶ 112–113 (J.A. 130); *see also id.* ¶ 118 (J.A. 132–133). In other words, Louisville Utilities was under an obligation to make customers in that market whole should MISO decide to charge pancaked fees.

Ultimately, Louisville Utilities negotiated Schedule 402, a new agreement with those municipalities already on or planning to join its grid. *See* J.A. 557. Schedule 402 protected several groups from pancaked rates with MISO: (i)

Louisville Utilities' current and future wholesale power customers, (ii) Owensboro Municipal Utilities ("Owensboro"), an entity that used Louisville Utilities' grid but was not a long-term wholesale customer, and (iii) a group of municipal agencies including P&P. *See* J.A. 557 (Schedule 402). Schedule 402's depancaking provisions were designed "to implement the Section 203 [merger] mitigation requirements ordered by the Commission" in the *1998 Merger Order* and the *2006 Withdrawal Order*. J.A. 559 (Schedule 402 § 1.a.v).

In November 2006, the Commission approved the agreement. *See Louisville Gas & Elec. Co.*, 166 FERC ¶ 61206, ¶ 8 & n.19 (2019) ("*March 2019 Order*") (J.A. 220–221).

Here is how depancaking worked under Schedule 402. When a customer imported power from MISO, Louisville Utilities refunded the customer's "transmission and ancillary services charges" for the electricity to reach the MISO/Louisville Utilities border. *See* J.A. 557–558 (Schedule 402, at 1; *id.* § 1.a.i). When a customer shipped power from Louisville Utilities' grid to MISO, the company waived its own corollary charges for ferrying the electricity to the MISO border. *See* J.A. 558–559 (Schedule 402 § 1.a.ii). Louisville Utilities' depancaking responsibilities were limited to those fees "where both [MISO] and [Louisville Utilities] provide and charge for corresponding services" that are "incurred to transmit electricity to" either the MISO or the Louisville Utilities border. J.A. 558–559 (Schedule 402 § 1.a.iv, 1.a.i–ii); *see also Louisville Gas*, 988 F.3d at 847.

With depancaking now ensured by Schedule 402, P&P finalized its investment in Prairie State in 2007, which it financed by borrowing more than $525 million. P&P also signed 50-year contracts to source electricity from a

hydroelectric project being built partially on the MISO grid. *See Louisville Gas & Elec. Co.*, 168 FERC ¶ 61152, ¶ 95 (2019) ("*2019 Rehearing Order*") (J.A. 302); *Louisville Gas & Elec. Co.*, 173 FERC ¶ 61164, ¶ 22 (2020) ("*November 2020 Order*") (J.A. 435–436). In statements to bondholders, Princeton and Paducah have said that they hold ownership interests in the hydropower project. *See* NEW ISSUE BOOK ENTRY, KENTUCKY MUNICIPAL POWER AGENCY 146, 189 (Aug. 22, 2019), http://www.kmpa.us/wp-content/uploads/202 0/12/KMPA-2019A-O.S..pdf, (last accessed July 26, 2022).

**3**

For more than a decade after the merger, most of Louisville Utilities' wholesale power customers relied on it for virtually all of their electricity needs, forgoing the opportunity to buy power from other utilities on the MISO grid at depancaked rates. *See March 2019 Order* ¶ 75. But after Louisville Utilities told one of those customers in 2012 that it would soon stop selling it electricity, all twelve municipalities began considering other power sources. In April 2014, most of the municipalities told Louisville Utilities that they would buy power from other suppliers starting in 2019. Eleven municipalities then jointly created the Kentucky Municipal Energy Agency ("Energy Agency") to allow them to buy electricity collectively. Energy Agency ran a competitive process to sign up suppliers, including some located in MISO, to provide power for most of its members starting in 2019. In this opinion, we refer to Energy Agency and its members collectively as "Energy Agency."[2]

---

[2] The members of Energy Agency are the Kentucky cities, or municipal power agencies representing the cities, of Barbourville,

13

**C**

**1**

In 2018, Louisville Utilities asked the Commission for permission to end its depancaking responsibilities under Schedule 402. The company argued that independent grids and new generators had boomed in the 20 years after the merger, creating robust competition for wholesale power and obviating the need for depancaking. Municipal Customers opposed the request. They argued that ending depancaking would increase their rates, block access to competitive markets, and unfairly interfere with business plans they had made in reliance on depancaking continuing.[3]

In March 2019, a divided Commission conditionally granted Louisville Utilities' request to halt depancaking. *See March 2019 Order* ¶ 2 (J.A. 218). The Commission held that, under Section 203 of the Federal Power Act, the only relevant question was whether depancaking was still needed to mitigate the merger's harm to competition for Louisville Utilities' wholesale customers. *See id.* ¶¶ 38–42 (J.A. 232–234). Under that approach, as long as the customers would "have access to a sufficient number of competitive suppliers" without depancaking, the Commission would deem the merger "consistent with the public interest[.]" *Id.* ¶ 42 (J.A. 234). In adopting that test, the Commission concluded that it could ignore the effect restoring pancaking would have on other,

---

Bardwell, Benham, Berea, Corbin, Falmouth, Madisonville, Owensboro, Paris, and Providence, along with the Frankfort Electric and Water Plant Board.

[3]  Several other parties also contested Louisville Utilities' proposal, but their claims are not before us.

long-established public-interest factors for mergers, such as rates. *Id.* ¶ 44 (J.A. 234–235).

Analyzing only the effect on competition, the Commission found that depancaking was no longer necessary. *See March 2019 Order* ¶ 68 (J.A. 245–246). Though pancaking would reduce the number of competitive suppliers in the market to some degree, the Commission focused on both record evidence of extensive competition between generators and economic analyses performed by Municipal Customers' and Louisville Utilities' experts. *See id.* ¶¶ 67–69 (J.A. 244–246).

The Commission held, though, that it "would not be consistent with the public interest" for Louisville Utilities to pancake rates when its customers had made business decisions based on the reasonable assumption that they would be protected from such duplicative costs. *See March 2019 Order* ¶ 79 (J.A. 250). The Commission found that the members of Energy Agency had reasonably relied on depancaking when contracting for energy from MISO-based suppliers. *Id.* ¶¶ 74–80 (J.A. 248–250). So the Commission created a "transition mechanism" to protect Energy Agency's reliance interests. *Id.* ¶ 74 (J.A. 248–249). Under that mechanism, the Commission directed Louisville Utilities to continue depancaking rates for a time-limited period confined to the "initial term" of "power purchase agreement[s]" entered into by Energy Agency when Schedule 402 depancaking was still in effect. *Id.* ¶ 82 (J.A. 251). An initial term, the Commission said, meant the agreement duration "before any extensions[.]" *Id.* ¶ 82 n.126 (J.A. 251). The Commission did not include P&P in the transition mechanism because it found it was "outside the [Louisville Utilities] market[.]" *Id.* ¶ 81 & n.125 (J.A. 250–251).

Commissioner LaFleur dissented. She contended that the evidence of current-day market competition was insufficient to show that ending depancaking was in the public interest. *See March 2019 Order* ¶¶ 1–3 (LaFleur, Comm'r, dissenting) (J.A. 260–261).

**2**

In April 2019, the Municipal Customers sought rehearing. Louisville Utilities did not. While that request was still pending, Louisville Utilities filed a proposed update to Schedule 402 to comply with the *March 2019 Order*. The Commission issued two more orders in response to those filings.

**a**

As relevant here, the Municipal Customers' rehearing request argued that the Commission erred by (i) failing to consider the effect that removing depancaking would have on rates, (ii) concluding that the Louisville Utilities' market would be sufficiently competitive without depancaking, (iii) excluding P&P from the transition mechanism, and (iv) limiting the transition mechanism to power purchase agreements, rather than all of the customers' financial commitments made in reliance on depancaking.

The Commission granted the Municipal Customers' request in part. *See 2019 Rehearing Order* ¶ 14 (J.A. 270). It first reaffirmed its decision to ignore the effect ending depancaking would have on rates. *Id.* ¶¶ 25–35 (J.A. 273–278). The agency recognized that it had previously considered the effect modifying merger conditions would have on all three of its typical Section 203 public-interest factors—competition, rates, and regulation. *Id.* ¶¶ 32–35 (J.A. 277–278) (citing *Louisville Gas & Elec. Co.*, 137 FERC ¶ 61195

(2011)). So the Commission announced that it was now "clarify[ing]" that its public-interest analysis of requests to modify merger conditions "is limited to addressing the effect of the modification on the public interest factor that [first] led the Commission to impose the condition[.]" *Id.* ¶ 35 (J.A. 278).

The Commission then reversed its decision to exclude P&P from the depancaking transition mechanism. *See 2019 Rehearing Order* ¶ 109 (J.A. 306–307). The agency found that P&P is in the Louisville Utilities market and had sourced power while relying on depancaking. *Id.*

Finally, the Commission expanded the scope of Louisville Utilities' depancaking responsibilities to include all contracts entered into by one of the Municipal Customers before the *March 2019 Order* in reliance on depancaking continuing. *See 2019 Rehearing Order* ¶ 110 (J.A. 307). That included "long-term financial commitments, such as * * * transmission service" contracts reserving the use of MISO's wires to transmit electricity, so long as such agreements were used to carry power that was purchased before the *March 2019 Order*. *Id.* ¶ 111 (J.A. 307). The Commission also directed the company to depancake P&P's fees associated with importing power from Prairie State, its partially owned coal plant on the MISO grid. *Id.* ¶ 112 (J.A. 307).

**b**

In a separate order, the Commission rejected Louisville Utilities' proposed transition mechanism to replace Schedule 402, making three additional determinations relevant here. *See Louisville Gas & Elec. Co.*, 168 FERC ¶ 61151 (2019) ("*2019 Transition Mechanism Order*").

First, the Commission rejected Louisville Utilities' argument that it would have been unreasonable for P&P to rely on depancaking when investing in Prairie State. *See 2019 Transition Mechanism Order* ¶¶ 31–36 (J.A. 321–322). Louisville Utilities argued that P&P made that investment decision in 2005, after it was already on notice that Louisville Utilities was leaving MISO and before the parties had agreed to Schedule 402. *Id.* ¶ 32. (J.A. 321). The Commission disagreed, finding that P&P only made a definitive Prairie State investment after Louisville Utilities had committed to depancaking in 2006, around the time the utility proposed leaving MISO. *Id.* ¶ 33 (J.A. 321). The Commission added that it was always "likely" that Louisville Utilities would only be allowed to leave MISO on the condition that it continue some form of depancaking. *Id.* ¶ 35 (J.A. 322). So P&P reasonably relied on pancake-free access to MISO when securing Prairie State power. *Id.* ¶¶ 31–36 (J.A. 321–322).

Second, the Commission directed Louisville Utilities to depancake fees associated with some contracts the company had omitted from its transition mechanism, including agreements several customers had made with generators outside of the MISO grid. *See 2019 Transition Mechanism Order* ¶¶ 39–42 (J.A. 324–325).

Third, the Commission determined that Louisville Utilities' depancaking obligation extended to three MISO fees—known as Schedules 26, 26-A, and 45—that the utility had depancaked under Schedule 402. *See 2019 Transition Mechanism Order* ¶¶ 57, 62 (J.A. 330, 332). The Commission explained that the transition remedy was meant to temporarily extend Schedule 402, and so Louisville Utilities had to depancake MISO fees associated with services that "correspond[]" to those for which Louisville Utilities also

charged.  *Id.* ¶ 62 (J.A. 332) (citation omitted); *see also id.* ¶ 79 (J.A. 337).

**3**

The Municipal Customers and Louisville Utilities sought rehearing as to both the *2019 Rehearing Order* and the *2019 Transition Mechanism Order*.  The Commission responded with two more orders.

In its second rehearing order, the Commission agreed to lessen Louisville Utilities' depancaking responsibilities in two ways.  *See Louisville Gas & Elec. Co.*, 172 FERC ¶ 61227 (2020) ("*Second Rehearing Order*").

First, the Commission held that Louisville Utilities only had to depancake rates and fees pertaining to Prairie State for ten years, rather than for the duration of the power agreements' open-ended terms.  *See Second Rehearing Order* ¶¶ 43–44 (J.A. 363–364).  The Commission recognized that, unlike other power purchase agreements covered by the transition mechanism, P&P's ownership right to Prairie State electricity had no clear end.  *Id.*  So absent the ten-year cap, requiring depancaking for the term of the contracts could commit Louisville Utilities to provide that relief indefinitely, which would go beyond the term-limited reliance the Commission meant to protect.  *Id.*

Second, the Commission reversed itself and held that Louisville Utilities need not depancake fees related to the Municipal Customers' purchase of power from generators outside of MISO.  *See Second Rehearing Order* ¶ 61 (J.A. 371–372).  The Commission reasoned that the transition mechanism only required Louisville Utilities to depancake fees that would have been protected under Schedule 402—in other words, those incurred to shuttle power to or from MISO.  *Id.*

¶¶ 61–62 (J.A. 371–372). So charges related to contracts with generators outside of MISO should not be covered. *See id.*

As for the rehearing petition addressed to the *2019 Transition Mechanism Order*, the Commission largely reaffirmed its initial decision. *Louisville Gas & Elec. Co.*, 173 FERC ¶ 61164 (2020) ("*Transition Rehearing Order*"). As relevant here, the Commission bolstered its decision to order Louisville Utilities to depancake the MISO fee known as Schedule 45 for covered agreements, citing evidence that Louisville Utilities charges corresponding fees. *See id.* ¶¶ 66–67 & n.117 (J.A. 407–408).

**4**

Louisville Utilities and Municipal Customers filed for rehearing as to both the *Second Rehearing Order* and the *Transition Rehearing Order*. The Commission rejected the requests. *See November 2020 Order* ¶ 22 (2020) (J.A. 435–436).

**II**

Municipal Customers—that is, Energy Agency and P&P—timely petitioned for review of the Commission's orders, as did Louisville Utilities. We have jurisdiction under 16 U.S.C. § 825*l*(b).

We review the Commission's orders "under the arbitrary-and-capricious standard, and we will uphold the [agency's] factual findings if they are supported by substantial evidence." *ESI Energy, LLC v. FERC*, 892 F.3d 321, 329 (D.C. Cir. 2018) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and requires * * * less than a preponderance of evidence[.]" *South Carolina Pub. Serv.*

*Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (per curiam) (internal quotation marks and citations omitted).

**III**

Municipal Customers challenge the Commission's orders on two fronts. First, they argue that the Commission erred by permitting Louisville Utilities to pancake rates because (i) the Commission lacked substantial evidence to find that the market would remain competitive without depancaking, and (ii) the Commission arbitrarily excluded from its public-interest analysis the effect ending depancaking would have on rates. Second, they contend that the Commission's transition mechanism insufficiently protected certain customers' reliance interests.

Louisville Utilities comes at the Commission's decisions from a different direction. It argues that, under agency precedent, P&P could not reasonably have relied on depancaking and so should not have been shielded from any pancaked charges going forward. Louisville Utilities also objects to being required to depancake three specific MISO fees, along with fees associated with P&P's hydroelectric project until 2057.

We hold that while the Commission reasonably found that sufficient competition would survive the return of pancaking, it was arbitrary and capricious for the agency to ignore the effect pancaking would have on rates. And while the agency's transition mechanism is reasonably justified for the most part, we conclude that the Commission inadequately explained two aspects of its orders.

**A**

**1**

Municipal Customers contend that the Commission lacked substantial evidence to find that sufficient wholesale power competition would continue even with the return of pancaking and its attendant rate increases.

The question, though, is not whether, on this record, reasonable minds could have reached a different conclusion on that question. It is only whether substantial evidence supported the Commission's conclusion and whether it reasonably explained its decision. The Commission's decision clears that bar. *See Environmental Action, Inc. v. FERC*, 939 F.2d 1057, 1064 (D.C. Cir. 1991) ("[I]t is within the scope of the agency's expertise to make [a reasonable] prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.").

The Commission grounded its decision in several relevant sources of data. Together, they provide substantial evidence that sufficient competition exists among companies able to sell power to wholesale customers on the Louisville Utilities grid, and that competition will continue even after the return of pancaked rates on power coming from MISO. *See March 2019 Order* ¶¶ 68–73 (J.A. 245–248); *2019 Rehearing Order* ¶¶ 58–77 (J.A. 288–295).

First, the Commission found that MISO-based generators can offer prices that are competitive with Louisville Utilities' rates even with pancaking. *See March 2019 Order* ¶¶ 69–70 (J.A. 246–247); *2019 Rehearing Order* ¶ 62 & n.87 (J.A. 289). The Commission cited a report from Municipal Customers' own expert, who forecast that Energy Agency's MISO-based

suppliers will charge rates that are only 2.5% higher, on average, than Louisville Utilities after accounting for pancaking. *See March 2019 Order* ¶ 70 (J.A. 246–247). That sufficed, the Commission explained, because it "considers [electricity] that can be delivered into a market at a price that is no more than five percent above the [market] price * * * to be competitive[.]" *Id.* (J.A. 246) (citing 18 C.F.R. § 33.3(c)(4)); *see also* Merger Statement, 61 Fed. Reg. at 68,607 & n.6.

The Commission's conclusion was bolstered by a competing forecast from Louisville Utilities' expert, who predicted that Energy Agency's rates from MISO would be 7.8% cheaper on average than Louisville Utilities' offerings even with pancaking. *See March 2019 Order* ¶ 69 (J.A. 246).

Second, the Commission found that competitive sources of electrical power exist outside MISO that will be unaffected by the end of depancaking. The agency determined that 65% of the capacity secured by Energy Agency was sourced from generators outside of MISO. (Capacity is a measure of the total electricity that a contracted power plant can produce.) *See March 2019 Order* ¶ 71 (J.A. 247); *2019 Rehearing Order* ¶¶ 64–65 (J.A. 290). Transmission fees from those plants are not depancaked under Schedule 402, so the Commission concluded that new pancaked rates "would have no effect on whether suppliers located in [such] markets remain competitive[.]" *March 2019 Order* ¶ 71 (J.A. 247).

Third, the Commission found that the number of generators that could profitably sell to the Louisville Utilities grid had increased substantially since 1998. At the time of the merger, there were only four to seven competitive potential wholesale energy suppliers for the grid. *See March 2019 Order* ¶ 72 & n.118 (J.A. 247–248). According to a Louisville Utilities expert that the Commission credited, more

than 100 suppliers could competitively sell to the grid in 2018, with available capacity to meet Municipal Customers' needs "several times over[.]" J.A. 593 (Prepared Testimony of Julie R. Solomon); *2019 Rehearing Order* ¶ 74 (J.A. 294).

Relatedly, the Commission found that the expansion of independent power grids had transformed the market for wholesale power since 1998. At the time of the merger, Louisville Gas & Electric's and Kentucky Utilities Company's grids were surrounded by several small networks, limiting the number of plants customers could buy from at competitive rates. *See March 2019 Order* ¶ 73 (J.A. 248). Now Louisville Utilities' neighbors include some of the largest independent grids on the continent—MISO and PJM Interconnection, L.L.C.—giving those customers ready access to independent power suppliers. *See id.* ¶ 73 (J.A. 248); J.A. 656 (grid map).

Finally, the Commission found an active and healthy wholesale energy market on the Louisville Utilities grid. *See March 2019 Order* ¶ 68 (J.A. 245). Energy Agency received proposals to replace Louisville Utilities as a power supplier from between 38 and 59 different companies. *Id.* So Louisville Utilities now faces far more rivals than it did at the time of the merger. *Id.*

Municipal Customers beg to differ. To start, they argue that the Commission lacked data on the competitiveness of offers made to Energy Agency, and so it could not rely on those offers to show a robust wholesale power market. Plus, the proposals were made with depancaking in place and so, the Customers argue, gave little information about what would happen once that protection ended.

Neither claim succeeds. As the Commission explained, its evidence about the competitiveness of MISO-based offers

came from Municipal Customers' own expert. *See 2019 Rehearing Order* ¶¶ 62–63 (J.A. 289); *March 2019 Order* ¶ 69 (J.A. 246). And his forecasted rates accounted for the end of depancaking. *See* J.A. 1001–1002 (Surrebuttal Affidavit of John F. Painter) (finding that "the imposition of pancaked transmission charges would be projected to increase" Energy Agency's power supply costs from MISO to "2.5% above [Louisville Utilities' rates]").[4]

Next, Municipal Customers assert that Louisville Utilities' market concentration analysis measured only potential suppliers and not actual market participants. In their view, that made it irrational for the Commission to treat the presence of more than 100 potential suppliers as evidence of actual competition.

The Commission adequately weighed this concern. It recognized that not all potential suppliers would offer to sell Municipal Customers electricity. *See 2019 Rehearing Order* ¶¶ 74–75 (J.A. 294). But the agency reasonably found the sheer number of large and competitive rivals would make for a sufficiently robust market, even if not all of the suppliers competed. *See id.*; *see also March 2019 Order* ¶ 72 (J.A. 247–248).

Lastly, the Municipal Customers contend that the Commission ignored the relative paucity of potential sellers during peak periods of energy demand. The Commission

---

[4] Municipal Customers assert that the Commission conceded that their expert's analysis does not accurately reflect prices absent depancaking. The Commission did no such thing. It simply summarized Municipal Customers' argument. *See 2019 Rehearing Order* ¶ 47 n.68 (J.A. 282) ("[Municipal Customers] contend that [their expert's analysis] is not representative of available prices from suppliers located in MISO without [depancaking.]").

answered that contention too. It acknowledged that pancaking would reduce the number of rival sellers in the market. *See March 2019 Order* ¶ 67 (J.A. 244); *2019 Rehearing Order* ¶ 71 (J.A. 293). But the Commission found that, even at the summer peak when the market is most concentrated, "there would remain at least 100" competitive sellers after the end of depancaking. *March 2019 Order* ¶ 72 (J.A. 247); *see also* J.A. 593–595 (Solomon Test.). And "[m]any of these are relatively large suppliers[,] and the total amount of supply [is] several times larger than the total [needs] of all [Louisville Utilities] customers." *March 2019 Order* ¶ 72 (J.A. 247– 248). That range of rivals ably supported the Commission's conclusion that pancaking would leave enough competition in its wake.[5]

In short, the Commission's conclusion that sufficient competition would continue after depancaking was based on substantial evidence from which it drew sensible inferences employing its expert knowledge of electricity markets. That is "the kind of reasonable agency prediction * * * to which we ordinarily defer." *Arkansas Elec. Energy Consumers v. FERC*, 290 F.3d 362, 370 (D.C. Cir. 2002) (citation omitted).

**2**

Municipal Customers further contend that it was arbitrary for the Commission to ignore completely the effect pancaking would have on customer rates.

---

[5] Municipal Customers object that the Commission erred by focusing only on short-term competition and by giving them the burden of more fully disclosing the proposals received by Energy Agency. Because Municipal Customers made these arguments only in their reply brief, they are forfeited. *See Union of Concerned Scientists v. Department of Energy*, 998 F.3d 926, 931 (D.C. Cir. 2021).

We agree. Agencies cannot disregard important aspects of a problem before them. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because increases in electricity rates—independent of competition concerns—were an important consideration under the facts of this case, as well as under agency and judicial precedent, the Commission erred by backhanding the effect that pancaking would have on rates.

When determining if a proposed merger is "consistent with the public interest," the Commission "generally" considers its effect on rates. 18 C.F.R. § 2.26(b). That makes sense, as the public interest "encompasses" the "various policies reflected in the statutes specific to energy regulation[,]" including the encouragement of "the orderly development of plentiful supplies of electricity * * * *at reasonable prices*." *Wabash Valley Power Ass'n*, 268 F.3d at 1115 (emphasis added and citations omitted).

Rate effects can have that same importance when the Commission evaluates supplemental merger orders under Section 203(b). After all, the Commission will modify a merger order only if the transaction will remain "consistent with the public interest[.]" *Westar Energy, Inc.*, 164 FERC ¶ 61060, at ¶ 15. Importantly, this rate analysis goes beyond just looking at competition because, as the Commission has recognized, markets do not always function perfectly. *See* Merger Statement, 61 Fed. Reg. at 68,603.

Yet here, the Commission expressly refused to even consider the effect ending depancaking would have on electricity rates. *See March 2019 Order* ¶ 44 (J.A. 234–235). The Commission held, instead, that because depancaking was imposed to protect competition, that was the only factor it needed to consider in ending the program. *Id.*

That "ostrich-like approach" will not do. *Environmental Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021). Commission precedent requires it to consider how modifying a merger order under Section 203(b) affects the public interest, *see Westar Energy, Inc.*, 164 FERC ¶ 61060, at ¶ 15, and a merger's effect on rates is a central factor in the agency's public-interest analysis, *see* 18 C.F.R. § 2.26(b). So the Commission could not sensibly brush off the effect of its supplemental order on customers' rates. *See also Emera Maine*, 155 FERC ¶ 61233, ¶ 37 n.68 (2016).

The refusal to look at rate effects was quite consequential in this case because rate hikes are not only likely—they are certain. All parties agree that they will happen. *See March 2019 Order* ¶ 79 (J.A. 250); Louisville Utilities Intervenor Br. 12. And both Municipal Customers and Louisville Utilities agree they will be material increases. Municipal Customers' expert estimated that if depancaking were scrapped, the municipalities' rates in 2019 would increase by at least 15%, with one customer's rates rising 47%. *See* J.A. 768 (Affidavit of John F. Painter (Oct. 2, 2018)). If depancaking continued, by contrast, Louisville Utilities forecast that the program would save customers at least $200 million in rate prices between 2018 and 2028. *See* J.A. 550 (Direct Testimony of Tom Jessee). By refusing to consider the material effects of its order on customer rates—a factor that its own regulations identify as a key component of the public interest, *see* 18 C.F.R. § 2.26(b)—the Commission engaged in "unreasoned, arbitrary, and capricious decisionmaking." *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017).

On top of that, the Commission had previously acknowledged the role of rates in its public-interest analysis when considering a different modification to a term of the Louisville Utilities merger. In a 2011 decision, the

Commission determined that all three of its standard public-interest factors—including rate effects—were relevant and evaluated them when modifying another order concerned with this very same merger. And it did so even though the order being modified was, as here, originally designed to address only competition concerns. *See Louisville Gas*, 137 FERC ¶ 61195, at ¶¶ 6–7, 39 (modifying orders meant to protect competition only after finding that the change would have no "adverse impact on * * * rates or regulation").

The Commission and Louisville Utilities make several counterarguments, none of which succeeds.

The Commission, for its part, asserts that its approach is supported by other Section 203(b) decisions that did not weigh rate effects. *See 2019 Rehearing Order* ¶¶ 15–16 & n.31 (J.A. 270–271) (citing Commission orders); *see also* Commission Br. 46–47.

Not at all. In the orders the Commission cites, the issue of price increases simply was not raised by any party. *See MidAmerican Energy Holdings Co.*, 131 FERC ¶ 61004, ¶¶ 8–11 (2010) (utility stated without rebuttal that modification would save ratepayers money); *Public Serv. Co. of New Mexico*, 135 FERC ¶ 61230, ¶¶ 9–11 (2011) (same); *PPL Corp.*, 153 FERC ¶ 61257, ¶ 22 (2015) (protestor arguing that modification would affect capacity, but not claiming any effect on rates); *Westar Energy*, 164 FERC ¶ 61060, at ¶¶ 13–16 (rate effects not at issue).[6]

---

[6] *See also* Commission Br. 46 (not contesting Municipal Customers' claim that "other public interest factors such as rate impacts were not raised" in the cited decisions) (formatting modified and citation omitted).

The Commission also argues that its earlier decision in *Louisville Gas* is inapposite because in that decision it was Louisville Utilities itself that raised the issue of rate effects, not the customers. *2019 Rehearing Order* ¶ 33 (J.A. 277–278). But if rate effects are an important part of the problem, then they remain so regardless of which party raises the concern. *See Spirit Airlines, Inc. v. Department of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Basic fairness and rational decisionmaking require no less.

Nor does it matter, as the Commission contends, that the Section 203(b) standard was not directly at issue in *Louisville Gas*. *See 2019 Rehearing Order* ¶ 33 (J.A. 277–278). The Commission there applied its understanding of the Section 203(b) standard, *see Louisville Gas*, 137 FERC ¶ 61195, at ¶¶ 1, 37–39, and so created agency precedent to complement what its regulation and prior cases had already said, *see* 18 C.F.R. § 2.26(b); *MidAmerican Energy Holdings Co.*, 131 FERC ¶ 61004, at ¶ 16.

The Commission tried to smooth over this conflict by holding that the agency was now "clarify[ing]" that, for supplemental orders, it would only consider the particular public-interest factor that the order approving the merger was meant to address. *2019 Rehearing Order* ¶ 35 (J.A. 278).

That is of no help. To be sure, an agency may depart from its precedent so long as it "display[s] awareness that it is changing position" and shows that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphases omitted).

But even assuming the Commission's "clarif[ication]" showed sufficient awareness of its changed position, the

agency failed to put its analysis where its mouth was. *2019 Rehearing Order* ¶ 35 (J.A. 278). In the very orders announcing this new approach, the Commission defied it. Rather than analyzing Louisville Utilities' request to end depancaking only in terms of its effect on competition, the Commission went on to address other public interest goals. For example, the Commission tailored its remedy to address some customers' reliance interests, reasoning that the "public interest requires" that its approval of Louisville Utilities' request be conditioned on protecting those interests. *March 2019 Order* ¶ 74 (J.A. 248–249).

So it seems the modification standard is not so narrow after all. And nowhere did the Commission explain why selectively excluding rate effects from the public-interest analysis would make any sense.

The Commission argues that because its rules only provide that it "*generally* consider[s]" rates under Section 203, and then only as to "proposed mergers[,]" it need not always weigh rate effects in evaluating supplemental order requests. Commission Br. 48–49 (emphasis added and citations omitted). But just because the Commission need not consider rates in every Section 203(b) proceeding does not mean the agency can ignore rate effects when they are raised and are significant. Because Commission rules and judicial precedent establish that customer rates are a cardinal consideration in determining whether a merger's terms are in the public interest, the Commission must address rates when they are an important aspect of the problem before it. *See* 18 C.F.R. § 2.26(b); *Wabash Valley Power Ass'n*, 268 F.3d at 1115.

Louisville Utilities, for its part, contends that because pancaking necessarily increases rates, analyzing rate effects here is a "circular inquiry that would inevitably favor keeping"

depancaking in place forever. Louisville Utilities Intervenor Br. 12. But Louisville Utilities' own evidence suggested otherwise. A Louisville Utilities executive testified that depancaking reduces Municipal Customers' rates but increases those of the retail and transmission customers whose bills pay for the program. *See* J.A. 551–552 (Jessee Test.); *see also* Merger Statement, 61 Fed. Reg. at 68,603 (on the rate effects prong, Commission will protect "wholesale ratepayers and transmission customers"). Beyond that, even if an inquiry into rates would favor keeping depancaking in place, that would not dictate the outcome of the Commission's full public-interest determination based on all relevant factors.

In sum, in this case, how restoring pancaking would affect rates was a critical part of the public-interest analysis to which the Commission could not close its eyes.

Vacatur is the "normal remedy" for "unsustainable agency action[,]" and neither the Commission nor Louisville Utilities "has * * * asked the court []or given us any reason to depart from that standard course of action." *Brotherhood of Locomotive Eng'rs & Trainmen v. Federal R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (citation omitted).

Even putting that forfeiture aside, the decision whether to vacate an order depends "on the seriousness of the order's deficiencies * * * and the disruptive consequences of an interim change that may itself be changed." *Environmental Def. Fund*, 2 F.4th at 976 (citation omitted). Considering those factors, we conclude that vacatur is appropriate.

The Commission's failure to consider an important public-interest factor—one that is central to the Federal Power Act's purpose of "encourag[ing] the orderly development of plentiful supplies of electricity * * * at reasonable prices[,]" *NAACP*, 425 U.S. at 670—was a "major shortcoming[] that [went] to

the heart of the [agency's] decision[,]" and so favors vacatur, *Humane Soc'y*, 865 F.3d at 614. A material effect on rates is not even disputed in this case, so we cannot find that there is a "significant possibility" that the Commission may be able to "find an adequate explanation for its actions on remand[,]" given that it must go back to the drawing table and entirely redo its public-interest analysis. *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (formatting modified and citation omitted). Though vacatur may cause some disruption, that disruption seems unlikely to be severe, as our decision implicates in large part the same type of rates that are required to be depancaked in the short term under the transition mechanism. We therefore vacate the Commission's decision to permit Louisville Utilities to end depancaking under Schedule 402 and remand for the agency to reconsider its decision in light of the direct and indirect effects ending depancaking would have on customers' rates.

**B**

Both Louisville Utilities and the Municipal Customers separately assail the Commission's transition mechanism. We review these challenges to provide the Commission guidance on remand, should it conclude—after considering the relevant factors—that ending depancaking under Schedule 402 is in the public interest. *See National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 844 (D.C. Cir. 2006) (Kavanaugh, J.) ("provid[ing] specific guidance to FERC on what it could do on remand if it chose to re-promulgate" orders vacated in part by the court); *cf. Oncor Elec. Delivery Co. v. NLRB*, 887 F.3d 488, 495 (D.C. Cir. 2018).

Louisville Utilities argues that the Commission erred in whom it protected—which parties qualified for the remedy. Then both Municipal Customers and Louisville Utilities

contend that the Commission erred in what it protected—which fees the agency required to be depancaked. We conclude that the Commission's decision as to whom to protect was reasonable and mostly reach the same conclusion regarding its decision as to what fees to cover.

**1**

Louisville Utilities argues that the Commission should not have required it to continue depancaking rates for P&P. In its view, P&P only ever enjoyed depancaked rates because Louisville Utilities voluntarily chose to provide them, making it unreasonable for P&P to think that depancaking would continue indefinitely. Louisville Utilities adds that it should not have to depancake fees associated with Prairie State in particular, because P&P did not in fact rely on depancaking when contracting with that generator.

Louisville Utilities is incorrect. The Commission's conclusion that P&P reasonably relied on continued depancaking was sound, and substantial evidence supports the Commission's finding that P&P committed to Prairie State in reliance on depancaked rates.

**a**

The Commission's transition mechanism was designed to protect "customers located in the [Louisville Utilities] market that reasonably relied on" depancaking in contracting for electrical power. *March 2019 Order* ¶ 80 (J.A. 250). P&P fit that bill.

To start, the Commission properly found that P&P is a customer in the Louisville Utilities market. *See 2019 Rehearing Order* ¶ 109 (J.A. 306–307). Like the other parties whose reliance interests the Commission protected—without

protest from Louisville Utilities—P&P is on the Louisville Utilities grid and a potential Louisville Utilities wholesale power customer that was expressly protected from pancaked rates under Schedule 402. *See March 2019 Order* ¶¶ 77, 81 (J.A. 249–251); *2019 Rehearing Order* ¶ 109 (J.A. 306–307); *Second Rehearing Order* ¶ 37 (J.A. 360); *cf.* J.A. 593 (Solomon Test.) (Louisville Utilities' expert analyzing competition effects of ending depancaking on P&P, among other customers).

The Commission's conclusion that P&P could reasonably rely on the protections of Schedule 402 was also sound because its depancaking provisions were designed to comply with earlier Commission orders, and so were not optional. *See Second Rehearing Order* ¶¶ 39–40 (J.A. 361–362); *Transition Rehearing Order* ¶¶ 45–46 (J.A. 395–397).

Louisville Utilities insists that it was only required to protect those customers in its wholesale market at the time of the merger in 1998, and it protected other entities in Schedule 402 only voluntarily.

Not so. Schedule 402, which depancaked P&P's rates with MISO, was by its terms "intended to implement the Section 203 mitigation requirements ordered by the Commission[.]" J.A. 559 (Schedule 402 § 1.a.v); *see Transition Rehearing Order* ¶ 45 (J.A. 395–396). And Louisville Utilities itself acknowledged, when first agreeing to protect P&P and other parties from rate pancaking that "it [was] counter-intuitive at [that] time to contemplate that FERC would permit the company to establish new rate pancakes" for the parties to the agreement. J.A. 450–451 (February 2006 Term Sheet § 1); *see Second Rehearing Order* ¶¶ 39–40 (J.A. 361–

362).[7]  So the Commission's conclusion that P&P reasonably believed itself protected from pancaked rates by the Commission was justified.

To be sure, the *2006 Withdrawal Order* only expressly directed Louisville Utilities to protect its wholesale customers from pancaked rates with MISO.  *See 2006 Withdrawal Order* ¶ 112 (J.A. 130).  But the Commission reasonably found that Louisville Utilities agreed to depancake P&P's rates because P&P was planning to join the Louisville Utilities wholesale market, and would then be protected by the Commission's merger orders.  *See Second Rehearing Order* ¶ 40 (J.A. 361–362); *Transition Rehearing Order* ¶¶ 45–46 (J.A. 395–397); *1998 Merger Order*, at 19 (J.A. 19) (protecting customers in Louisville Utilities' wholesale market).  In other words, Louisville Utilities agreed to Schedule 402 because it had to depancake rates for entities in its wholesale market subject to its "horizontal market power[,]" which it understood at the time would likely soon include P&P.  *2006 Withdrawal Order* ¶ 112 (J.A. 130); *see also Second Rehearing Order* ¶ 40 (J.A. 361); *cf.* J.A. 583, 601 (Solomon Test.) (Louisville Utilities expert assessing the competitive effects of pancaking on all Schedule 402 customers on the company's grid).  Especially given our deference to the Commission's interpretation of tariffs like Schedule 402, that is substantial evidence supporting the agency's conclusion that Louisville Utilities did not voluntarily depancake P&P's rates with MISO.  *See City*

---

[7]  *Cf. LG&E Energy LLC on behalf of Louisville Gas and Electric Co. et al.*, Midwest ISO Withdrawal & Independent Transmission Organization/Reliability Coordinator Implementation Filing, FERC Accession No. 20051007-4004 (Oct. 7, 2005), at 20 ("[Louisville Utilities] seek[s] to ensure that [its] withdrawal from [M]ISO * * * is consistent with the Commission's goal of eliminating transmission rate pancaking.").

*& County of San Francisco v. FERC*, 24 F.4th 652, 660 (D.C. Cir. 2022).

On top of that, in protecting P&P, the Commission was hewing to the *March 2019 Order*, to which Louisville Utilities never objected. *See Second Rehearing Order* ¶ 37 (J.A. 360). In that decision, the Commission required Louisville Utilities to temporarily depancake rates for the City of Owensboro, another Schedule 402 customer that was not one of Louisville Utilities' wholesale clients in 1998. *See March 2019 Order* ¶ 77 (J.A. 249). Louisville Utilities tries to distinguish Owensboro's coverage, asserting that the city, unlike P&P, was on its grid in 1998. But Owensboro indisputably was not a Louisville Utilities wholesale customer in 1998. That goes to show that the Commission found it reasonable for entities to rely on depancaking even if they were not Louisville Utilities wholesale customers at the time of the merger—a holding to which the company did not object when the Commission first adopted it in 2019. *See Second Rehearing Order* ¶ 37 (J.A. 360).

**b**

The Commission also reasonably found that P&P relied on depancaking when it invested in Prairie State.

Louisville Utilities argues that it was "chronologically impossible" for P&P to "rely on de-pancaking when deciding to invest in Prairie State" because it began investing in the generator after Louisville Utilities had announced plans to leave MISO and before it signed Schedule 402. Louisville Utilities Opening Br. 36.

That argument misses the mark. As the Commission found, P&P first agreed to invest only a modest amount in Prairie State in February 2005, when Louisville Utilities was

still in MISO and unable to pancake rates with other parts of that grid. *See Transition Rehearing Order* ¶ 47 (J.A. 397). While the utility's request to leave MISO was pending, P&P looked into other electricity options, recognizing that fully investing in a generator in MISO might be uneconomical with pancaked rates. *See id.*; *see also* J.A. 1240–1242 (Thornton Aff.). It was only after the Commission accepted Schedule 402, with its promise of depancaking for P&P, that P&P made the decision to invest hundreds of millions of dollars in Prairie State. *See Transition Rehearing Order* ¶ 47 (J.A. 397); J.A. 1235, 1239–1240 (Thornton Aff.). That is substantial evidence of reliance.

**2**

Turning to Municipal Customers' and Louisville Utilities' challenges to the Commission's design of its reliance interest remedy, we generally find no error, with two exceptions.

Because the transition remedy was designed to "protect the economics of the decisions made by [Municipal Customers] while [depancaking] was in effect[,]" the Commission ordered Louisville Utilities to depancake fees associated with agreements entered before the *March 2019 Order* to the same extent as they would have been covered under Schedule 402. *Transition Rehearing Order* ¶ 77 (J.A. 412); *see id.* ¶¶ 24–25 (J.A. 386–387).

To ensure that the transition mechanism only covered "reasonabl[e]" reliance interests, the Commission only required continued depancaking for the "initial term" of covered power agreements. *March 2019 Order* ¶¶ 80, 82 (J.A. 250–251); *see also 2019 Rehearing Order* ¶ 111 (J.A. 307); *Transition Rehearing Order* ¶¶ 49, 83 (J.A. 398–399, 415–416).

In applying those principles, the Commission made several choices about what types of fees were covered, which financial commitments to protect, and how long its remedy should last. Municipal Customers and Louisville Utilities each challenge some of those details.

**a**

Louisville Utilities argues that the Commission arbitrarily required it to depancake three MISO fees known as Schedules 26, 26-A, and 45. The utility claims that it does not charge fees that correspond to those schedules, so MISO's bills are not duplicative, leaving no pancaked rates to depancake.

The Commission reasonably found otherwise. Schedules 26 and 26-A are MISO's overhead charges to customers for construction that benefits multiple parts of its grid. *See 2019 Transition Mechanism Order* ¶ 63 (J.A. 332). As the Commission noted, Louisville Utilities does not similarly divide its grid into zones, and its building requirements are different. *See id.*; *Transition Rehearing Order* ¶ 64 (J.A. 405–406)*.* But what matters for purposes of depancaking is that Louisville Utilities collects fees from its customers for the same basic purpose as Schedules 26 and 26–A: that is, building and maintaining transmission capacity. *See 2019 Transition Mechanism Order* ¶ 63 (J.A. 332); *Transition Rehearing Order* ¶ 64 (J.A. 405–406). Depancaking the Schedule 26 and 26-A fees ensures that customers do not pay for that same type of overhead twice.

As for the Schedule 45 charges, MISO uses those fees to pay for the costs of responding to grid reliability alerts. *See 2019 Transition Mechanism Order* ¶ 64 (J.A. 332–333); *Transition Rehearing Order* ¶¶ 66–67 & n.117 (J.A. 407–408). The Commission found that Louisville Utilities charges fees to that same end. *See Transition Rehearing Order* ¶¶ 66–67 &

n.117 (J.A. 407–408). Though Louisville Utilities contends that Schedule 45 covers "discretionary and site-specific" responses, it has no answer to the Commission's evidence that it also charges customers to address the same type of incidents. Louisville Utilities Opening Br. 41–42.

Given that record, Louisville Utilities provides no basis for us to reject these technical and record-specific factual findings by the Commission. *See Electric Power Supply Ass'n*, 577 U.S. at 292.

**b**

Contrary to the Municipal Customers' objection, the Commission properly limited its transition mechanism to their preexisting agreements with entities in MISO because Schedule 402 itself only applied to such contracts. *See Second Rehearing Order* ¶ 61 (J.A. 371–372); *Transition Rehearing Order* ¶¶ 76, 83 (J.A. 412, 415–416).

Though Municipal Customers contend that some municipalities had relied on backup energy in MISO when securing power outside of MISO, the Commission sensibly focused its remedy on the agreements that fell squarely within Schedule 402—that is, contracts with entities inside MISO. *See Transition Rehearing Order* ¶¶ 76, 83 (J.A. 412, 415–416). In doing so, the Commission reasonably declined to embroil itself in the intractable task of trying to discern which other arrangements that themselves would not have been protected by Schedule 402 were in some sense still reliant on it. Even if another decision would have been reasonable, that is the type of "line-drawing" that "[w]e are generally unwilling" to overturn unless the lines drawn are "patently unreasonable, having no relationship to the underlying regulatory problem." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085

(D.C. Cir. 2002) (formatting modified and citation omitted). Municipal Customers have not shown that.

**c**

Turning to the Commission's decision to require Louisville Utilities to depancake P&P's rates tied to Prairie State only for ten years, Louisville Utilities says there is too much coverage. P&P says there is too little coverage. We say the Commission got it just right enough.

P&P's investment in Prairie State presented the Commission with a conundrum. P&P had counted on continued depancaking in investing in the Prairie State project, creating a reliance interest. *See 2019 Rehearing Order* ¶ 111 (J.A. 307). Investing in the project—which includes a coal plant, a coal mine, and related facilities—took considerable resources. *See* J.A. 1285 (Prairie State Project Power Sales Agreement Attach. 1); *Second Rehearing Order* ¶ 44 (J.A. 364).

Yet the arrangement did not fit easily into the Commission's decision to cabin the transition mechanism to the initial term of power purchase agreements. *See Second Rehearing Order* ¶¶ 44, 53 (J.A. 364, 368–369); *March 2019 Order* ¶ 82 n.126 (J.A. 251). P&P's arrangement with Prairie State lasts until all of the consortium's relevant "obligations and liabilities" have been paid *and* the project "has been terminated[.]" *See* J.A. 1255 (Prairie State Project Power Sales Agreement § 101). That could be decades and decades down the line. Because P&P's arrangement with Prairie State has no "readily apparent 'term'"—or, rather, has an indefinite term—bringing the entire Prairie State arrangement into the transition mechanism would saddle Louisville Utilities with potentially perpetual depancaking duties, which the Commission found incompatible with the time-limited nature

of the remedy. *See Second Rehearing Order* ¶¶ 43–44 (J.A. 363–364); *see also id.* ¶ 53 (J.A. 368).

Balancing P&P's reliance interests against the burden of indefinite mitigation, the Commission capped Prairie State-related depancaking to a "proxy term" of ten years. *November 2020 Order* ¶ 20 (J.A. 435). For support, the Commission pointed to one of its earlier merger mitigation decisions, *NextEra Energy, Inc.*, 165 FERC ¶ 61199 (2018). *See Second Rehearing Order* ¶ 44 & n.70 (J.A. 364). In *NextEra*, the Commission found that it needed to retain a mitigation measure to preserve competition for only approximately ten years because, by that point, new generators might enter the market and replace the rivalry lost in the merger. *See* 165 FERC ¶ 61199, at ¶ 31. Similarly here, the Commission found that a decade would give P&P enough time to "plan for future market conditions[,]" and the benefit of "new entry" from other generators to provide energy alternatives. *November 2020 Order* ¶ 20 (J.A. 435).

Municipal Customers respond that P&P's agreements with Prairie State contain a definitive end date, albeit one that "is not expressed as a calendar date[.]" Municipal Customers Opening Br. 35–36.

That misses the point. The Commission defined an "initial term" to mean "the term specified in [a] power purchase agreement before any extensions pursuant to an evergreen provision or other provision[.]" *March 2019 Order* ¶ 82 n.126 (J.A. 251). In that way, the Commission drew a line against protecting contracts if they were extended and re-extended. In other words, to confine the remedy to reasonable reliance interests for a reasonable period of time, the Commission "phase[d]-out the De-pancaking Mitigation," rather than allowing it to continue indefinitely. *Second Rehearing Order*

¶¶ 43, 67 (J.A. 363, 374); *see also March 2019 Order* ¶ 80 (J.A. 250). So it made sense to set a reasonable time limit for Prairie State depancaking that would be fair under the circumstances. *See Second Rehearing Order* ¶¶ 43–44 (J.A. 363–364). P&P, for its part, never even proposed an alternative fixed timeframe the Commission could have used as an initial term instead. *See* J.A. 1482–1485 (Municipal Customers Rehearing Request as to the *Transition Rehearing Order* and *Second Rehearing Order*); Municipal Customers Opening Br. 33–38.

Both Louisville Utilities and Municipal Customers contend that the Commission acted arbitrarily by relying on *NextEra* to select a term for Prairie State depancaking. To Louisville Utilities, *NextEra* involved the question of how long merger mitigation "should exist *in the first place*, not how long it should take to transition away from" it. Louisville Utilities Opening Br. 39 (internal quotation marks omitted). Because Louisville Utilities had been depancaking rates for more than a decade already, it argues that the Commission's directive to cover Prairie State fees for ten more years was irrational. Municipal Customers, meanwhile, argue that *NextEra* inappositely dealt with the question of how long mitigation is needed to protect competition, not reliance interests, and the approximately ten-year mitigation term there was based on case-specific facts.

Those are fair points. But not enough to displace the Commission's judgment. The Commission never claimed that the facts of *NextEra* mapped onto the Prairie State situation perfectly. Instead, the Commission found *NextEra* to be a helpful benchmark because the approximately ten-year mitigation period in that case (i) gave the affected parties time to adjust to the new market landscape, by (ii) allowing for more competitive entry. *See November 2020 Order* ¶ 20 (J.A. 435). Those same considerations apply to the Commission's

transition mechanism here. Like the affected parties in *NextEra*, P&P will now face a new market and cost environment; ten additional years of depancaking will give it a cushion to "plan accordingly." *Id.* And if there is "competitive new entry[,]" as the Commission predicted, P&P's reliance interests may diminish as new providers lower the costs of switching to a new energy source. *Id.* So while *NextEra* dealt with a different factual scenario, its principles have purchase here, and the Commission's judgment in that regard was well within its broad remedial powers under Section 203(b). *See Environmental Action*, 939 F.2d at 1064 (deferring to Commission merger condition decision because "agency discretion is, if anything, at [its] zenith when the action assailed relates to the fashioning of policies, remedies[,] and sanctions") (formatting modified and citation omitted).

Municipal Customers respond that P&P can do nothing to "plan" for the end of depancaking because it is irrevocably committed to Prairie State. Municipal Customers Opening Br. 38 (citation omitted). But the Commission only guarded reasonable reliance interests, *March 2019 Order* ¶ 80 (J.A. 250), and it was not unreasonable for the Commission to leave P&P responsible for some portion of its open-ended investment in Prairie State given that nothing in Schedule 402 promised that its depancaking would continue indefinitely. *See* J.A. 559 (Schedule 402 § 1.a.v) (recognizing that parties to the depancaking provisions could seek changes with the Commission); *Second Rehearing Order* ¶ 53 (J.A. 368) ("[T]he Transition Mechanism * * * was intended to protect, for a limited period of time, the customers that accessed the market and reasonably relied on the De-Pancaking Mitigation when making their past power supply choices.").

**d**

Next, Louisville Utilities argues that the Commission's order to depancake P&P's rates related to a hydroelectric project was arbitrary. We agree.

The Commission held that P&P should be protected from pancaked fees relating to a hydropower project in which it held an ownership stake. *See November 2020 Order* ¶ 22 & n.35 (J.A. 435–436). Because P&P's power agreements with the project last "until December 31, 2057, or until other conditions occur[,]" the Commission found that depancaking must continue until the end of 2057. *Id.* (citation omitted).

That reasoning cannot be reconciled with the Commission's determination that the transition mechanism was meant to extend depancaking only for a "limited period of time[.]" *Second Rehearing Order* ¶ 53 (J.A. 368). The Commission had just said that ten years of mitigation was enough to protect P&P's similar long-term investment in Prairie State. *See id.* ¶ 44 (J.A. 364). Yet here, the Commission concluded that mitigation must continue for an additional 38 years—simply because the hydropower agreements contained a concrete end date of 2057. *See November 2020 Order* ¶ 22 (J.A. 435–436).

That makes no sense. If ten years of protection suffices for an ownership interest that continues "indefinitely[,]" something in the neighborhood of ten years would seem the relevant timeframe to protect another exceptionally long investment. *Second Rehearing Order* ¶ 44 (J.A. 364); Municipal Customers Opening Br. 36 (recognizing inconsistency between Commission's hydropower holding and its Prairie State decision). The Commission failed to explain why the fact that an agreement will terminate by a date certain justified extending the mitigation term for nearly four decades.

Though we are deferential to the Commission's remedial decisions, we cannot overlook such unexplained inconsistency. *See Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 358 (D.C. Cir. 2003) ("A grant of discretion to an agency does not, of course, authorize it to make an unprincipled decision[.]").

The Commission responds that its decision was not unduly discriminatory because parties with "clear initial terms and those without clear initial terms are not similarly situated." Commission Br. 70. But the agency's mistake was not that it did not factually distinguish the two cases. The Commission simply failed to explain why that distinction matters, given that the point of the transition mechanism was to protect reasonable reliance interests for a reasonable time, not to protect those who happen to have tied their agreements to a calendar. *See Second Rehearing Order* ¶ 53 (J.A. 368).

Should the Commission conclude on remand that the public interest supports ending depancaking under Schedule 402, it must either better explain this aspect of the transition mechanism or take a fresh approach to the question.

**e**

Finally, Municipal Customers contend that the Commission arbitrarily declined to protect the entirety of a transmission reservation Energy Agency purchased from MISO. Here too, we find the Commission's reasoning inexplicable.

Before the *March 2019 Order*, Energy Agency agreed to an eight-year deal to reserve capacity on MISO's wires for imported power. *See Second Rehearing Order* ¶ 49 (J.A. 366); J.A. 1178 (Affidavit of John F. Painter (Aug. 2, 2019)). That capacity reservation gives Energy Agency the temporary

right to ship electricity, using MISO lines, from MISO-based generators to the border with Louisville Utilities. *See* J.A. 1181 (2019 Painter Aff.); *Louisville Gas*, 988 F.3d at 845–846 (explaining how transmission reservations work). As part of that agreement, Energy Agency is contractually "obligated to make monthly payments for the MISO * * * capacity reserved" regardless of how much it uses. J.A. 1173 (2019 Painter Aff.); *see also 2019 Rehearing Order* ¶ 104 & n.142 (J.A. 304–305).

The Commission agreed that the reservation must be depancaked, but only so long as it is used to transmit power purchased before the *March 2019 Order*. *See 2019 Rehearing Order* ¶ 111 (J.A. 307). The agency asserted that, unlike power purchase agreements, a transmission reservation is "not a separate financial commitment that merits" independent protection. *Second Rehearing Order* ¶ 53 (J.A. 368). If those agreements were covered, the Commission said, Energy Agency could "preserve * * * de-pancaking for future power supply transactions not yet entered into[.]" *Id.* That would be unreasonable, according to the Commission, because customers now "have access to competitive power supply choices[.]" *Id.* (J.A. 368–369).

That rationale does not make sense. The Commission said it would protect Municipal Customers' commitments (i) that were reasonably reliant on depancaking, (ii) for a reasonable initial term, and (iii) that would have been protected under Schedule 402. *See March 2019 Order* ¶ 80 (J.A. 250); *2019 Rehearing Order* ¶ 111 (J.A. 307); *Second Rehearing Order* ¶ 43 (J.A. 363–364). Energy Agency's transmission reservation checks each of those boxes.

Energy Agency's transmission reservation was indisputably made in reliance on depancaking, *see 2019 Rehearing Order* ¶ 111 (J.A. 307), and there was unrebutted

record evidence that Energy Agency owes monthly fees for eight years even if its reserved capacity is unused, *see* J.A. 1173 (2019 Painter Aff.); *see also 2019 Rehearing Order* ¶ 104 & n.142 (J.A. 304–305). In addition, the Commission had already decided that transmission reservations used to import power from MISO—like those at issue here—must be depancaked under Schedule 402. [8] On this record, the Commission's holding that transmission reservations are not "separate financial commitment[s]" meriting independent protection was conclusory and inconsistent with the plain criteria of the transition mechanism. *Second Rehearing Order* ¶ 53 (J.A. 368).[9]

That customers now enjoy a competitive power market is beside the point. *See Second Rehearing Order* ¶ 53 (J.A. 368–369). If today's competitive market obviated reliance interests, there would be no need for the transition mechanism at all. But the Commission balanced competing interests and explicitly concluded that reliance interests in electricity contracts must be protected for a reasonable period of time:

---

[8] *See 2019 Rehearing Order* ¶ 111 & n.148 (J.A. 307) (citing *Owensboro Mun. Utils.*, 166 FERC ¶ 61131 (2019), *rev'd*, *Louisville Gas*, 988 F.3d at 843); *Owensboro Mun.*, 166 FERC ¶ 61131, at ¶¶ 41–44 (requiring Louisville Utilities to depancake a Schedule 402 customer's "transmission reservation" in MISO); *Louisville Gas*, 988 F.3d at 848 (Commission required Louisville Utilities to depancake a customer's "reservation charges * * * apparently for the life of the contract with MISO").

[9] It does not matter for this decision that the Sixth Circuit later vacated the Commission's order requiring Louisville Utilities to depancake a transmission reservation in MISO. *See Louisville Gas*, 988 F.3d at 843; *see also Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 406 (D.C. Cir. 2005). The Sixth Circuit's decision was issued after the challenged orders, and so it cannot retroactively make earlier Commission decisions that did not rely on it reasonable.

"Although we have determined that there would continue to be a sufficient number of competitive suppliers [absent depancaking]," it would nevertheless "not be consistent with the public interest to" end depancaking "without a [remedy] accounting for [customers'] reliance on that mitigation." *March 2019 Order* ¶ 79 (J.A. 250). So the Commission's competition finding does nothing to justify reaching a different result for transmission reservations than it did for power purchase agreements.

The Commission's claim that depancaking Energy Agency's entire transmission reservation would unduly extend its remedy to future power agreements was also baseless. *See Second Rehearing Order* ¶¶ 51–53 (J.A. 367–368). The Commission did not explain why Louisville Utilities could not depancake the portions of the reservation to which Energy Agency irrevocably committed before the *March 2019 Order* without covering other fees that may attend its future use. That amounts to a failure of reasoned decisionmaking. *See Spirit Airlines*, 997 F.3d at 1255 ("An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.") (citation omitted).

The Commission and Louisville Utilities argue that "power purchase agreements and transmission service reservations are different, especially in light of the determination that customers now have competitive supply choices." Commission Br. 78; *see also* Louisville Utilities Intervenor Br. 16–17. But that simply repeats the Commission's hollow explanation for limiting its protection of the transmission contract that we have already found wanting. If the Commission chooses again to end Schedule 402 depancaking on remand, it must come forward with a logical explanation for its decision here that is consistent with the

purpose and scope of the transition mechanism, or it must extend depancaking on reasoned terms to Energy Agency's transmission contract.

**IV**

For all those reasons, we grant the petitions in part, vacate the challenged orders in part, and remand for further proceedings consistent with this opinion.

*So ordered.*