# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 5, 2012          Decided January 11, 2013

No. 12-5116

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,
ON BEHALF OF THE PARTICIPANTS AND BENEFICIARIES OF THE
THUNDERBIRD MINING CO. PENSION PLAN, ET AL.,
APPELLANTS

v.

PENSION BENEFIT GUARANTY CORPORATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00517)

———

*Andrew D. Roth* argued the cause for appellant. With him on the briefs were *Laurence Gold* and *David R. Jury*. *Jeremiah A. Collins* entered an appearance.

*Kenneth J. Cooper*, Assistant General Counsel, Pension Benefit Guaranty Corporation, argued the cause for appellee. With him on the brief were *Judith R. Starr*, General Counsel, *Kimberly J. Duplechain*, Attorney, *Israel Goldowitz*, Chief Counsel, *Karen L. Morris*, Deputy Chief Counsel, *Kartar S. Khalsa*, Assistant Chief Counsel, and *Nathaniel Rayle*, Attorney.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: This is an appeal from the district court's judgment affirming a decision of the Pension Benefit Guaranty Corporation, the government agency that administers pension termination insurance under Title IV of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461, commonly known as ERISA. In this case, participants in the Thunderbird Mining Company Pension Plan sought "shutdown" pension benefits. These early retirement benefits are triggered by a "permanent shutdown of a plant, department or subdivision thereof" and are payable to plan participants who meet certain age and years-of-service requirements.[1] The agency denied the participants' requests.

Eveleth Mines, LLC, doing business as EVTAC Mining, and its wholly owned subsidiary, Thunderbird Mining Company (we refer to the two companies collectively as "Eveleth"),

---

[1] Under the terms of Thunderbird's pension plan, "70/80 Retirement" benefits are payable upon a permanent shutdown to a participant "who has not attained the age of 62 years and who shall have had at least 15 years of continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more, or (ii) whose combined age and years of continuous service shall equal 80 or more." "Rule-of-65 Retirement" benefits are payable upon a permanent shutdown to a participant "(i) who shall have had at least 20 years of continuous service as of his last day worked, (ii) who has not attained the age of 55 years, and (iii) whose combined age and years of continuous service shall equal 65 or more but less than 80."

produced taconite pellets in a plant in Minnesota. Taconite pellets are used in the production of iron and steel. In early 2003, Eveleth suffered a drastic reduction in orders when two of its primary customers (joint owners of an approximately 85 percent interest in Eveleth) decided to begin purchasing taconite pellets from other sources.

On February 14, 2003, Eveleth sent a confidential letter to the local district director of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, the union representing Eveleth's approximately four hundred hourly employees. Citing a "lack of customer orders," the letter advised the union of the company's intention to "close permanently" the mining operation "on or about May 14, 2003." The company noted that it was prepared to discuss its proposed course of action and invited the union to "suggest alternative courses."

Unable to secure new orders, Eveleth filed for bankruptcy under Chapter 11 of the Bankruptcy Code,[2] and on May 15, 2003, ceased production and laid off all but four of its hourly employees. According to a March 10, 2003, notice that Eveleth issued to its employees,[3] the closure was expected to be temporary, "but only if anticipated pellet orders are received during the shutdown period."

---

[2] Eveleth Mines filed for bankruptcy on May 1, 2003, and Thunderbird Mining filed for bankruptcy two weeks later, on May 15, 2003. The two cases were jointly administered.

[3] The notice was issued under the Worker Adjustment and Retraining Notification Act, which requires employers, under certain circumstances, to give employees at least sixty days' notice of a plant closing or mass layoff. *See* 29 U.S.C. § 2102(a).

In connection with the shutdown, management instructed the four remaining hourly employees (and twenty-nine salaried employees) to secure the plant site by, among other things, welding shut the doors and gates, repairing damaged equipment and plumbing, shutting off the electricity, and disconnecting the batteries in equipment and vehicles. The plant had been temporarily shut down in the past, and similar work had been performed. But unlike during prior shutdowns, during this shutdown the plant was not maintained in "standby condition." On June 15, 2003, after this work was completed, Eveleth laid off the four remaining hourly employees, but retained a staff of salaried employees to handle administrative tasks and prevent fire and flooding. In a subsequent filing with the bankruptcy court (in October), the company stated that it "continue[d] to maintain the equipment and other assets associated with its mining operations to protect the enterprise value of its estate" while it sought a purchaser or funding for a plan of reorganization.

On July 5, 2003, Eveleth's president and the local union president met with Jim Oberstar, then a congressman from Minnesota, and discussed Eveleth's failure to secure new sales contracts. The congressman, who knew the Chinese ambassador to the United States, recommended that Eveleth negotiate with Laiwu, a Chinese corporation, to either secure new sales contracts or sell the company's assets. About three months later, in early October, Laiwu and an Ohio mining company offered to purchase Eveleth's assets, with the intention of operating the plant and producing taconite pellets. The proposed sale terms required Eveleth "to restore its mining operations to operating condition consistent with industry practice" in advance of the proposed closing on December 1, 2003. The bankruptcy court approved the sale on November 25, 2003, and the transaction closed on December 1, 2003. On that date, Eveleth permanently laid off all of its employees except three members of

management. During the month of December, the purchasers hired substantially all of the company's former hourly employees under the terms of a new collective bargaining agreement.

Meanwhile, after receiving notice of Eveleth's bankruptcy filing in May, the Pension Benefit Guaranty Corporation began analyzing the company's prospects and its ability to sustain its pension plan. The pension-guaranty agency insures participants in defined-benefit pension plans, such as the plan participants in this action, against the loss of certain benefits when the plan lacks sufficient assets to pay promised benefits in full. Subject to certain limitations, when an underfunded pension plan is terminated, the agency guarantees the payment of "nonforfeitable" benefits (i.e., those benefits for which a participant has satisfied the conditions for entitlement under the terms of the plan, as of the date of termination, *see* 29 U.S.C. § 1301(a)(8)). *See id.* § 1322; *see also PBGC v. LTV Corp.*, 496 U.S. 633, 636–38 (1990). (This insurance is funded, in part, from premiums paid by employers who sponsor covered pension plans, *see* 29 U.S.C. §§ 1306, 1307, and recoveries from employers whose underfunded plans have terminated, *see id.* § 1362.) If the agency determines that a pension plan will be unable to pay benefits when due or that the agency's loss with respect to the plan will increase unreasonably if the plan is not terminated, the agency may initiate proceedings to terminate the plan. *See* 29 U.S.C. § 1342(a)(2), (4).

Having determined that Eveleth's pension plan had a "funded ratio" of only 52 percent and that Eveleth had "no realistic prospect of adequately funding it," the agency concluded that the plan would be unable to pay benefits when due. The agency also concluded that its long-run loss with respect to the plan would increase unreasonably if the plan was not soon terminated. This was largely because, after Eveleth's

bankruptcy filing and the cessation of production in May 2003, laid-off employees had submitted applications for shutdown pension benefits, asserting that their employer had permanently ceased operations. While Eveleth, in its role as plan administrator, took the position that the shutdown was only temporary and thus denied such benefits, the agency believed there was a strong possibility that the shutdown would soon become permanent. The agency determined that upon such a permanent shutdown, the plan would owe an additional $70 million in benefits, of which about $35 million would be guaranteed by the agency. In addition, as of August 1, 2003, the "phase in" of an earlier benefit increase was estimated to increase guaranteed, but unfunded, benefits by approximately $1.6 million.

Accordingly, on July 24, 2003, the agency filed an action in federal district court, pursuant to 29 U.S.C. § 1342(c), seeking to terminate the plan and to establish July 24, 2003, as the plan termination date. As has been its practice, *see Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 150–51 (D.C. Cir. 2006), the agency asked that the court appoint it as the trustee of the plan. While neither Eveleth, as plan administrator, nor the union opposed termination of the plan or the agency's appointment as trustee, the union intervened in the action to oppose the proposed termination date as "not . . . in the best interests of the participants of [the] plan." Later the union withdrew its opposition to the proposed termination date after reaching an agreement with Eveleth relating to the sale of Eveleth's assets. On August 19, 2004, the district court issued an order terminating the plan, appointing the agency as trustee, and establishing July 24, 2003, as the plan termination date.

From December 2006 to May 2007, the agency issued benefit-determination letters setting forth the monthly payment each plan participant was entitled to receive. None of the

benefits determinations included shutdown benefits. The union therefore filed an administrative appeal on behalf of approximately 240 participants who believed they were eligible for shutdown benefits. On November 30, 2007, the agency's Appeals Board issued a final decision concluding that the agency would not guarantee shutdown benefits for plan participants because Eveleth had not permanently shut down before the plan was terminated on July 24, 2003.

The union, on behalf of employees who claimed to be eligible for shutdown pension benefits, and several individual employees, brought this action in district court under 29 U.S.C. § 1303(f) to challenge the agency's decision. The district court rejected plaintiffs' contention that the agency's decision is subject to *de novo* review, holding instead that the agency's decision is entitled to deference and should be reviewed under the Administrative Procedure Act's "arbitrary or capricious" standard. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. PBGC*, 839 F. Supp. 2d 232, 241–44 (D.D.C. 2012). Applying that standard, the district court granted summary judgment in favor of the agency. The agency's "determination that the [Eveleth] plant had not permanently shut down prior to July 24, 2003," the court ruled, "is supported by the record . . . and is rationally connected to the facts in this case." *Id.* at 252.

I

ERISA permits plan participants who are "adversely affected" by an action of the pension-guaranty agency to bring suit against the agency in district court, 29 U.S.C. § 1303(f), but the statute does not specify the standard of judicial review. In such a case, a court generally must apply the "arbitrary or capricious" standard of the Administrative Procedure Act, 5

U.S.C. § 706(2)(A). *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004).

Plaintiffs contend, however, that the "arbitrary or capricious" standard does not apply here. Noting that the term "permanent shutdown" is not defined in Eveleth's pension plan, they argue that the agency's determination was based on its interpretation of the pension plan—a question of law, according to plaintiffs, that is subject to *de novo* review.

We do not see why this matters. The parties do not disagree about what constitutes a "permanent shutdown." Plaintiffs and the agency both say that a permanent shutdown, for purposes of Eveleth's pension plan, occurs when the company has no reasonable expectation of resuming operations. The dispute here is thus not about the definition of "permanent shutdown." The dispute instead is over the application of that definition to the facts of this case and, in particular, over the significance of the fact that Eveleth did not maintain the plant in "standby condition" during the shutdown. In the administrative context, we generally review an agency's application of an undisputed legal standard to a particular set of facts under a deferential standard. *See, e.g.*, *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 590–91 (2d Cir. 1961) (Friendly, J.) (treating application of undisputed legal standard to facts as "question of fact" subject to "substantial evidence" standard of § 10(e) of the National Labor Relations Act).[4]

---

[4] Even if the question here were one of contract interpretation, that would not end the analysis. This court has concluded that under certain circumstances it may be appropriate to defer to an agency's interpretation of a contract. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1568–72 (D.C. Cir. 1987). Because the interpretation of the pension plan is not in dispute here, we do not decide whether the agency's interpretation of a pension plan or similar contract is entitled to any deference.

Plaintiffs do not suggest that the company's failure to maintain the plant in standby condition is conclusive in determining whether a permanent shutdown occurred. Their point is that this should have been a critical factor in the agency's analysis. Contrary to plaintiffs' suggestion, however, the agency did not reject this factor as irrelevant. Rather, the agency asserted that the failure to maintain the plant in standby condition "would [not] foreclose any reasonable likelihood of resuming operations." Consolidated Appeals Board Decision, Case 199929 (Nov. 30, 2007), at 8. (More on this later.) The agency's determination was thus largely factual and involved only the application of an undisputed definition to the facts of this case. Such a determination is entitled to deference under the Administrative Procedure Act and "should not be set aside just because a court would, as an original matter, decide the case the other way." *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968).

II

Although this is a fairly close case, the record provides sufficient support for the agency's judgment that a permanent shutdown had not occurred before Eveleth's pension plan was terminated on July 24, 2003. The agency's determination, in other words, was not arbitrary or capricious.

In arguing to the contrary, plaintiffs point out the differences between this shutdown and previous temporary shutdowns. When the plant was temporarily shut down in the past, fifteen to twenty hourly employees continued to work there. But during this shutdown only four hourly employees stayed on the job. According to one employee's declaration, during prior temporary shutdowns the remaining employees "rotated the second line kiln in order to prevent 'flat spots' and other damage . . . to the equipment." The employee added that,

in contrast, during this shutdown "management instructed the remaining four workers that it was not necessary to rotate the kilns." Although during both past temporary shutdowns and this shutdown management instructed the employees to move all vehicles to the parking lot and to leave space between the parked vehicles in order to prevent excessive damage in the event of a fire, during this shutdown the company also instructed the employees to disconnect the batteries in all of the vehicles. And whereas during previous temporary plant shutdowns most vendors left their leased equipment at the plant site, in this case management terminated the vendors' leases and the vendors removed their equipment from the plant site.

This evidence tends to weigh against the agency's finding and in favor of a finding that the shutdown was in fact permanent. But in judicial review of agency action, weighing the evidence is not the court's function. Rather, the question for the court is whether there is "such relevant evidence as a reasonable mind might accept as adequate to support" the agency's finding that the shutdown was *not* permanent. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (internal quotation marks omitted). (Although that is a description of the "substantial evidence" standard, "in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984).) This standard leaves open the possibility of sustaining the agency's determination even though one might draw "two inconsistent conclusions from the evidence." *Consolo*, 383 U.S. at 620.

Eveleth's failure to maintain the plant in standby condition could signify that the company expected this shutdown to last longer than those in the past—and that is what the agency concluded. In the agency's view, the company's failure to

maintain the plant in standby condition "did not foreclose the likelihood of resuming operations," Consolidated Appeals Board Decision at 9, and in light of evidence that the company was still seeking to secure new sales contracts in July, two months after the company ceased operations, we conclude that substantial evidence supported the agency's decision.

As plaintiffs point out, Eveleth had stated, in its February 14, 2003, letter to the union's local district director, that it was the company's "intention" to "close permanently" the mining operation "on or about May 14, 2003." About a month later the company notified its employees that the plant was to be closed on May 15, 2003, but stated that the planned closure was to be *temporary* as long as anticipated pellet orders were received during the shutdown period. Although the notice did not specify when the "shutdown period" would end or when new orders would have to be received in order for the plant to resume operations, it was not unreasonable for the agency to discount the February letter in light of this notice.

Plaintiffs also point to Eveleth's June 5, 2003, letter in support of its petition (on behalf of its employees) for "trade adjustment assistance," in which it advised the Department of Labor that Eveleth "is now totally shut down and only a skeleton crew is employed."[5] But this letter does not necessarily help plaintiffs' case. The letter said nothing about whether that shutdown was permanent or whether the company expected to resume operations.

Although we might well be able to uphold as reasonable a finding in favor of plaintiffs' position, the record provides

---

[5] Title II, chapter 2, of the Trade Act of 1974, as amended, 19 U.S.C. §§ 2271–2323, created a federal program that provides benefits and reemployment services to workers who have lost their jobs as a result of increased imports.

sufficient support for the agency's determination that Eveleth had not permanently shut down before July 24, 2003. Accordingly, the district court's grant of summary judgment in favor of the agency is

*Affirmed*.