# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 21, 2025        Decided August 8, 2025

No. 23-1196

LOUISVILLE GAS AND ELECTRIC COMPANY AND KENTUCKY
UTILITIES COMPANY,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY UTILITY COMMISSION OF THE CITY OF OWENSBORO,
ALSO KNOWN AS OWENSBORO MUNICIPAL UTILITIES, ET AL.,
INTERVENORS

———

Consolidated with 24-1006, 24-1026, 24-1082

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Christopher R. Jones* argued the cause for petitioners. With him on the briefs were *Misha Tseytlin*, *Kevin M. LeRoy*, *Emily A. O'Brien*, *Russell Kooistra*, and *Mary-Kaitlin Rigney*. *Antonia Douglas*, *Amie V. Colby*, and *Miles H. Kiger* entered

appearances.

*Kim N. Smaczniak*, Special Counsel, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Beth G. Pacella*, Deputy Solicitor. *Scott R. Ediger*, Attorney Advisor, entered an appearance.

*Jeffrey M. Bayne* argued the cause for intervenors for respondent. With him on the brief were *Jeffrey A. Schwarz*, *Thomas C. Trauger*, and *Lauren L. Springett.*

Before: MILLETT, WILKINS, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judges* WILKINS and CHILDS.

WILKINS and CHILDS, *Circuit Judges*: The Federal Energy Regulatory Commission ("FERC" or "the Commission") regulates the interstate electricity market, ensuring that customers can access competing power generators across a region at reasonable prices. Pursuant to this authority, the Commission reviews certain mergers between public utilities and sets terms and conditions or issues supplemental orders as needed to secure the public interest. *See* 16 U.S.C. § 824b(a)(4), (b).

In 1998, the Commission approved a merger between two electrical grid operators, Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU"). The Commission conditioned its approval on the merged entity ("Louisville Utilities" or "Petitioners") becoming a member of a regional independent grid operator, which would enable its customers to pay a single, grid-wide transmission rate when buying power from generators across the region. The Commission later issued a supplemental order permitting

Louisville Utilities to end its membership on the condition that it ensure its customers would continue not to pay redundant transmission fees. Then, in 2019, the Commission issued a second supplemental order granting Louisville Utilities' request to end that obligation to prevent redundant fees altogether. We vacated and remanded the 2019 order, determining that the Commission failed to conduct a comprehensive analysis of whether the order was in the public interest under 16 U.S.C. § 824b.

On remand, the Commission issued a new order, this time rejecting Louisville Utilities' bid to end its fee obligation, and then denied rehearing. Louisville Utilities now brings consolidated petitions for review challenging the Commission's orders as arbitrary and capricious, an abuse of discretion, and not in accordance with law. We determine that the Commission's orders did not run afoul of its statutory mandate or its precedent. However, we conclude that the Commission failed to adequately consider other potential protections for customers as an alternative to Louisville Utilities' fee obligation or explain how those protections would be inadequate to protect particular customers. We accordingly grant Louisville Utilities' petitions, vacate the orders, and remand to the Commission once again.

## I.

### A.

The Federal Power Act ("FPA") authorizes the Commission to regulate the transmission and sale of electricity in interstate commerce. *See id.* § 824b(a). "The main goal of the Federal Power Act is to encourage the orderly development of plentiful supplies of electricity . . . at reasonable prices." *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 166 (D.C. Cir. 2022) ("*KYMEA*") (internal quotations omitted) (citing *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105,

1115 (D.C. Cir. 2001)).   To further that goal, the FPA requires public utilities to seek approval from the Commission before executing certain mergers.   *See* 16 U.S.C. § 824b(a).

Under subsection 203(a) of the FPA, the Commission reviews proposed mergers to determine whether they are "consistent with the public interest."   *Id*. § 824b(a)(4). Under subsection 203(b), the Commission can set in its orders "such terms and conditions as it finds necessary or appropriate to secure" the public interest.   *Id.* § 824b(b).   Subsection 203(b) also permits the Commission "from time to time for good cause shown" to "make such orders supplemental to any order made under this section as it may find necessary or appropriate."   *Id*.

The Commission has set out in regulations its process for determining whether a proposal is consistent with the public interest.   The Commission "generally" considers the proposal's effect on:   (1) competition in the market; (2) rates paid by customers; and (3) the relationship between the Commission's regulatory jurisdiction and that of state regulatory authorities.   *See* Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act, Policy Statement, 61 Fed. Reg. 68,595, 68,596 (Dec. 30, 1996) (to be codified in 18 C.F.R. pt. 2) ("1996 Merger Policy Statement"); *KYMEA*, 45 F.4th at 167–68.

**B.**

In 1998, pursuant to its authority under section 203, the Commission approved the merger of LG&E and KU to form the combined entity Louisville Utilities (the "Merger Order").[1] Fearing the merger could increase concentration in the wholesale energy market in the region, the Commission

---

[1] A prior panel opinion details the history of this case.   *See KYMEA*, 45 F.4th at 165–74.

conditioned its approval of the merger on Louisville Utilities joining a regional electrical grid operator, the Midwest Independent Transmission System Operator, Inc. ("MISO"). "Grid operators typically charge fees to ferry electricity to a neighboring transmission network, like a state levying tolls to drive on its highways." *KYMEA*, 45 F.4th at 167. As a result, "when an electricity customer wishes to buy power from a plant located on another grid it may face pancaked rates—transmission fees stacked on top of one another much like the total tolls paid when driving on a route that includes both the Pennsylvania and New Jersey turnpikes." *Id.* (citation modified). By contrast, grid operators in MISO charge only one grid-wide transmission fee, effectively "depancaking" fees that would otherwise stack on top of one another. The requirement that Louisville Utilities join MISO addressed the merger's potential anti-competitive effects because it enabled customers to buy from any generator across the region without paying pancaked rates, increasing the number of suppliers able to reach markets and lowering market concentration.

Several years after the merger was approved, in 2005, the Commission issued a supplemental order granting Louisville Utilities' request to leave MISO (the "2005 Supplemental Order"). Again, the Commission imposed a condition for its approval: even after leaving MISO, Louisville Utilities had to continue to depancake, ensuring that the affected customers would remain protected from redundant fees. To comply with this requirement, Louisville Utilities had to reimburse customers by covering MISO's redundant charges because MISO did not agree to reciprocally depancake its fees. Therefore, Louisville Utilities created a rate schedule agreement setting rates for the customers covered by its depancaking obligations, called Schedule 402, which the Commission then approved.

After over a decade of depancaking rates following its departure from MISO, Louisville Utilities requested that the

Commission end its depancaking obligations altogether (the "Mitigation Removal Proposal" or the "Proposal"). In 2019, the Commission issued an order largely approving the Mitigation Removal Proposal and concluding that the market would remain competitive without depancaking (the "2019 Supplemental Order"). The Commission also ordered Louisville Utilities to create a "transition mechanism," where Louisville Utilities would continue to depancake certain rates for a period into the future to address the interests of customers who had relied on depancaking in their contract and investment decisions. In conducting its public interest analysis, the Commission considered only the potential effect on competition, without considering the potential effect on rates paid by customers.

## C.

On appeal, we reviewed the Commission's 2019 Supplemental Order ending Louisville Utilities' depancaking obligations. *See KYMEA*, 45 F.4th at 166. We held that the Commission reasonably concluded that the market would remain competitive without depancaking but that the Commission acted arbitrarily by completely ignoring the effect of ending depancaking on rates. *Id.*

Even though the original merger condition addressed only the potential effect on competition, we determined that the Commission was obligated to consider the other public interest factors. *Id.* at 177–79. We reasoned that the Commission's refusal to look at rate effects was "quite consequential" because "rate hikes are not only likely—they are certain." *Id.* at 177. We also rejected Louisville Utilities' argument that requiring an analysis of rate effects would keep depancaking in place forever. Even if the Commission determined that the rates factor favored keeping depancaking in place, "that would not dictate the outcome" of the Commission's evaluation of all the public interest factors. *Id.* at 179. Finally, we largely upheld

the Commission's consideration of reliance interests in developing the transmission mechanism, taking issue only with two determinations that specific projects had shown sufficient reliance interests. *Id.* at 180–82, 186–87.

Accordingly, we vacated the Commission's 2019 Supplemental Order and remanded for the Commission to "reconsider its decision in light of the direct and indirect effects ending depancaking would have on customers' rates." *Id.* at 180.

**D.**

On remand, the Commission issued a new order, this time rejecting the Mitigation Removal Proposal (the "Remand Supplemental Order"). The Commission conducted a rates analysis and concluded that the Proposal would have an adverse effect on rates that would not be mitigated or offset by the benefits.

The Commission first set out the framework for its rates analysis. It decided to apply the FPA's section 203 public interest analysis to the Proposal itself, not to the original merger. Accordingly, the Commission evaluated the effect of the Proposal on rates by comparing rates prior to the Proposal (i.e., depancaked rates implemented through Schedule 402) to those that would exist after implementation of the Proposal (i.e., repancaked rates). The Commission declined to use the original merger as the point of reference for its analysis, which would have required it to compare rates prior to the merger (i.e., rates pancaked between LG&E, KU, and MISO) to rates after the merger when accounting for the Proposal (i.e., rates depancaked between now-merged LG&E and KU but pancaked with MISO). The Commission explained that the original merger order did not contemplate the depancaking provisions contained in Schedule 402, which were implemented in the 2005 Supplemental Order as part of

Louisville Utilities' exit from MISO. The Commission understood its framework to be consistent with our directive in *KYMEA* to consider "the effect of its supplemental order on customers' rates." *See* 45 F.4th at 177.

Applying that framework, the Commission then determined that the Proposal would have an adverse effect on rates "for the customers involved." J.A. 249. The Commission relied on our statement in *KYMEA* that rate hikes are "certain" and on testimony from customers regarding an increase in municipalities' rates. *See* 45 F.4th at 177. Louisville Utilities argued that the Commission should not view the Proposal as a "rate increase" because all customers would begin paying their "properly allocated cost of service" once Louisville Utilities ended the subsidized, depancaked rates for Schedule 402 customers. J.A. 446. The Commission was unpersuaded based on its assessment that the "affected customers" would face higher rates in the absence of depancaking. J.A. 249–50.

The Commission next found that the adverse effect on rates would not be offset or mitigated by the Proposal's benefits. Louisville Utilities identified several possible benefits. It argued that the Proposal benefited the customers not covered by Schedule 402 by ending their higher rates that subsidize the Schedule 402 customers' depancaked rates. The Commission rejected that argument, reasoning that other customers' potential benefits did not alter the Commission's finding that the Proposal would result in an adverse effect on Schedule 402 customers. The Commission also explained that Schedule 402 customers were not receiving an undue benefit because Schedule 402 places them in the same position they would have been had Louisville Utilities not withdrawn from MISO.

Louisville Utilities also suggested that the Commission's prior, undisturbed finding that the Proposal would not have an

anti-competitive effect could serve as an offsetting benefit. The Commission disagreed, explaining that it had found that the market would remain sufficiently competitive after the Proposal, not that the Proposal itself had a "specific benefit to competition." J.A. 251. The Commission also noted that it was "not convinced" that the effect on rates could be offset by the other elements of the Commission's public interest analysis. J.A. 251. Finally, the Commission reasoned that it did not need to address our conclusions in *KYMEA* regarding the transition mechanism because the transition mechanism was moot.

Louisville Utilities petitioned for rehearing, arguing that the Commission erred by analyzing the Proposal as a stand-alone transaction, misapplied its rates analysis, and failed to consider the transition mechanism in the record as a possible tool to mitigate any adverse rate effect. The Commission denied the petition, standing by its original analysis ("Rehearing Order"). The Commission also explained that Louisville Utilities had not proposed the transition mechanism as a ratepayer protection but rather to protect reliance interests, and, regardless, the transition mechanism was insufficient to protect all affected customers. Louisville Utilities then petitioned for review of the Commission's orders with this Court. Several municipally owned utilities (collectively, "Kentucky Municipals") intervened. We have jurisdiction under 16 U.S.C. § 825*l*(b).

## II.

We review the Commission's orders under the Administrative Procedure Act's arbitrary and capricious standard to determine whether the Commission's decision-making was reasoned, principled, and based upon the record. *See KYMEA*, 45 F.4th at 174; *Env't Def. Fund v. FERC*, 2 F.4th 953, 967–68 (D.C. Cir. 2021). Action by the Commission will be set aside as arbitrary and capricious if the Commission:

(1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Env't Def. Fund*, 2 F.4th at 967 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). We uphold the Commission's factual findings if they are supported by substantial evidence. *See KYMEA*, 45 F.4th at 174.

## III.

### A.

Petitioners first challenge the Commission's framework for conducting its rates analysis. They argue that the Commission ran afoul both of subsection 203(b) and Commission precedent when it analyzed the Mitigation Removal Proposal as a stand-alone transaction, instead of analyzing whether the 1998 merger would remain in the public interest in the absence of depancaking. We disagree.

### 1.

The Commission's framework for analyzing the Proposal's effect on rates did not violate subsection 203(b). Nothing in the statutory text limits the Commission to considering only the circumstances at the time of the original merger order.

Subsection 203(b) permits the Commission "from time to time for good cause shown" to "make such orders supplemental to any order made under this section as it may find necessary or appropriate." 16 U.S.C. § 824b(b). The text does not speak to how the Commission should determine whether to issue a supplemental order as it finds necessary or appropriate.

*Id.* Rather, the text provides the Commission flexibility in deciding how to conduct its analysis. *Cf. Chippewa & Flambeau Imp. Co. v. FERC*, 325 F.3d 353, 358 (D.C. Cir. 2003) (explaining that "necessary or appropriate" standard in FPA section 309 shows "Congress invested the Commission with significant discretion" to "set out a series of relevant factors" to govern its analysis).

Nonetheless, Petitioners argue that the text of subsection 203(b) contains a tie-back to the original merger order that limits the Commission's analysis to the circumstances at the time of the merger. In particular, Petitioners read the phrase "any order made under this section" in subsection 203(b) to refer only to the list of proposed transactions in subsection 203(a)—as relevant here, only to mergers. But the text of the provision is broader than that.

"[A]ny order made under this section" refers to any order made under the entirety of section 203, not just under subsection (a). *See, e.g.*, *United States v. Hines*, 694 F.3d 112, 117–18 (D.C. Cir. 2012) (interpreting the phrase "under this section" contained in one subsection to encompass the entire section); *Benitez Sampayo v. Bank of N.S.*, 313 U.S. 270, 272 (1941) (determining it was "hardly open to question" that the phrase "for the purposes of this section" contained in a subsection meant for purposes of the section the phrase appeared within). The original merger order was issued under subsection 203(a) and the supplemental order granting Petitioner's request to withdraw from MISO was issued under subsection 203(b). Both the Merger Order and the 2005 Supplemental Order thus are orders "made under" section 203. The statutory text does not bind the Commission's analysis to the original merger order.

**2.**

Petitioners argue that even if the Commission did not

violate subsection 203(b), the orders are arbitrary and capricious because they improperly depart from the Commission's own precedent. In particular, Petitioners assert that the Commission ran afoul of its prior decision in *Westar Energy*, where the Commission assessed under subsection 203(b) whether "to continue to find that Westar's acquisition of [a facility] [wa]s consistent with the public interest if the mitigation measures and reporting requirements previously required [we]re removed." *Westar Energy, Inc., Inc.*, 164 FERC ¶ 61,060 at P 15 (2018). Petitioners read *Westar Energy* to require the Commission to evaluate the merger if the depancaking obligations were removed, not the Proposal itself. We are unpersuaded. *Westar Energy* does not require the Commission to consider the circumstances at the time of the original merger order.

The arbitrary-and-capricious standard of the APA requires the Commission to provide "a reasoned explanation where [it] departs from established precedent." *Verso Corp. v. FERC*, 898 F.3d 1, 7 (D.C. Cir. 2018) (citation modified) (citing *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 672 (D.C. Cir. 2007)). "But where the circumstances of the prior cases are sufficiently different from those of the case before the court, [the Commission] is justified in declining to follow them, and the court may accept even a laconic explanation as an ample articulation of its reasoning." *Nat'l Weather Serv. Emps. Org. v. Fed. Lab. Rels. Auth.*, 966 F.3d 875, 884 (D.C. Cir. 2020) (internal quotations omitted) (citing *Gilbert v. NLRB*, 56 F.3d 1438, 1445 (D.C. Cir. 1995)).

*Westar Energy* neither involved nor addressed the manner of analysis for an order supplementing an earlier supplemental order. Instead, *Westar Energy* concerned an order directly supplementing an original merger order. *See* 164 FERC ¶ 61,060 at PP 1–2. As a result, considering the circumstances at the time of the original merger order in *Westar Energy* did not require skipping over the imposition of additional

conditions over time through supplementary orders, as it would here. Where there is already a supplemental order to the original merger order, *Westar Energy* does not control the Commission's analysis. As the Commission explained in its order, therefore, "on the facts of this case," *Westar Energy* does not preclude the Commission from looking to the Proposal itself. J.A. 297.

Even though *Westar Energy* does not govern the Commission's orders on review here, the Commission nonetheless acknowledged that, in its vacated 2019 Supplemental Order, it interpreted *Westar Energy* as Louisville Utilities does now—to require an assessment of whether "the Merger continues to be consistent with the public interest without" depancaking. J.A. 126. To the extent the Commission even needed to address a departure from a now-vacated order, the Commission sufficiently explained that it "reconsidered" its interpretation of *Westar Energy* in accordance with its interpretation of subsection 203(b) to allow for an analysis of the Proposal itself. J.A. 297.

**B.**

Petitioners' next contention is that the Commission's decision to deny their Mitigation Removal Proposal because it would adversely affect rates was arbitrary and capricious. We hold that the Commission properly concluded that rates would adversely increase without depancaking under Schedule 402. However, the Commission did not adequately consider whether the transition mechanism agreements it previously ordered Petitioners to create could act as ratepayer protections to offset the adverse increase.

**1.**

A "central factor in the [Commission's] public[ ]interest analysis" under FPA section 203 is to analyze whether the

parties "have taken sufficient steps" to ensure a proposal "will not increase customers' rates." *KYMEA*, 45 F.4th at 168, 177. In carrying out this analysis, the Commission investigates "applicants' claims about the potential costs and benefits of their propos[al] and weigh[s] that information to determine whether the costs are likely to exceed the benefits." 1996 Merger Policy Statement, 61 Fed. Reg. at 68,602. The "Commission's focus 'is on the effect that a proposed transaction itself will have on rates, whether that effect is adverse, and whether any adverse effect will be offset or mitigated by benefits that are likely to result from the proposed transaction.'" *Policy Statement on Hold Harmless Commitments*, 155 FERC ¶ 61,189 at P 5 (2016) (quoting *Policy Statement on Hold Harmless Commitments*, 150 FERC ¶ 61,031 at P 3 (2015)). The "[a]pplicants bear the burden of proof" to show that their customers will be protected from rate hikes. *KYMEA*, 45 F.4th at 168 (internal quotations and alterations omitted); *see also* 1996 Merger Policy Statement, 61 Fed. Reg. at 68,603. The Commission will consider "the applicants' burden of proof to be met by a generalized showing of likely costs and benefits." 1996 Merger Policy Statement, 61 Fed. Reg. at 68,602. Ratepayer protections are one benefit that parties can offer to offset an adverse increase in costs consumers may experience. *Id.* at 68,603.

In its Remand Supplemental Order following our opinion in *KYMEA*, the Commission held that approving Petitioners' Mitigation Removal Proposal would have an adverse effect on rates and therefore denied Petitioners' request to end protections provided in Schedule 402. *See* J.A. 246. As discussed *supra*, in evaluating whether rates would adversely increase, the Commission compared depancaked rates under Schedule 402 to those that would exist after ceasing depancaking under Schedule 402. J.A. 247–48. The Commission chose to focus its rates comparison analysis on Schedule 402, instead of comparing the merger-as-a-whole's effect on rates because of our instructions in *KYMEA*, 45 F.4th

at 177–78, and the fact that Schedule 402 was "not required, nor contemplated, under the original merger order" but instead only implemented when Petitioners exited MISO. J.A. 248. The Commission held that "[r]emoving rate depancaking will cause the affected customers to pay more for . . . transactions regardless of whether the rates in each zone are changing," and "[t]his constitutes an adverse effect on rates. J.A. 249–50.

Petitioners contend that FERC arbitrarily and capriciously determined that removal of depancaking would adversely affect rates. Pet'rs' Br. 42–44. Although Petitioners seem to acknowledge their previous concession that "rate hikes are not only likely—they are certain"—they contend that it is not an increase *per se* if removal of depancaking would simply restore charges to customers that the customers would have been obligated to pay all along if it were not for depancaking. *See KYMEA*, 45 F.4th at 177; *see also* J.A. 249; Pet'rs' Br. 44–45. In other words, Petitioners contend that even if there will be rate increases from the removal of depancaking, these increases are not "unnecessary." Pet'rs' Reply Br. 15–16. Petitioners point to two types of authority to support their contention that only unnecessary rate hikes can be adverse increases: (1) FPA's cost-causation principle [2] and (2) Commission precedent.

*First*, as to Petitioners' contention that the FPA's cost-causation principle supports their argument, we easily find that it does not. The cost-causation analysis "under section 205" of the FPA on which Petitioners rely "differs from the analysis" the Commission conducts "under [s]ection 203 of the FPA." *Silver Merger Sub, Inc.*, 145 FERC ¶ 61,261 at P 65 (2013) ("*Silver Merger*"); *see also Nev. Power Co.*, 145 FERC

---

[2] The "unremarkable" cost-causation principle requires "that all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (internal quotations omitted).

¶ 61,170 at P 51 (2013) ("Generally, the Commission does not address the rate treatment of assets in section 203 proceedings, but instead reserves such discussion for a section 205 proceeding."); *Sw. Power Pool, Inc.*, 175 FERC ¶ 63,023 at P 363 (2021) (explaining that courts have used the "cost causation principle" in interpreting the "just and reasonable" standard language under section 205 of the FPA); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1297–98, 1301 (D.C. Cir. 1992) (considering cost-causation principles after pipelines attempted to recoup costs from a "take-or-pay problem" by increasing customer rates).

*Second*, Petitioners' contention that "long-standing FERC precedent" conflicts with the Commission's conclusion that rates will adversely increase if depancaking is removed also fails. Pet'rs' Br. 45. Petitioners cite to a section in the Commission's 2016 Policy Statement on Hold Harmless Commitments which explains that if an energy provider is undertaking to "fulfill documented utility service needs" it need not "offer a hold harmless commitment in order to show that the transaction does not have an adverse effect on rates." 155 FERC ¶ 61,189 at P 87. However, Petitioners have not alleged that their 1998 merger was meant to "satisfy resource adequacy requirements at the state level, . . . improve system reliability, and/or meet other regulatory requirements" and therefore this section of the Policy Statement is inapplicable. *Id.* at P 86.

Moreover, other FERC precedent that Petitioners cite is inapposite to the present case. For example, in *GridLiance West Transco LLC*, the Commission considered a "unique circumstance[]" where one party to a merger transaction was a nonprofit organization and one party was a for-profit organization. 160 FERC ¶ 61,002 at P 52 (2017). The Commission held that because the for-profit organization would not seek to recover acquisition premium from the nonprofit organization, and the nonprofit organization operated

on a wholly different business structure from the for-profit organization—whereby the for-profit organization had a different capital structure, tax obligations, and a need to earn a return—the .48% rate increase would not be adverse. *Id.* Petitioners' merger is between two for-profit organizations and the rate increase is estimated to range from 15% to 47%—a significantly higher increase than the Commission considered in *GridLiance West Transco LLC*. *See KYMEA*, 45 F.4th at 177.

As to cases Petitioners cite to support their contention that the Commission never deems removal of depancaking to be an adverse effect on rates, we find that the Commission has not acted contrary to its precedent. Take *Translink Transmission Company, LLC*, for example. 101 FERC ¶ 61,140 (2002). There the Commission did not hold that rate pancaking would not be an adverse increase to rates, as Petitioners suggest, but instead that it could not determine the "full impact" of "rates on any particular customer" until the "actual rates [we]re filed and approved." *Id.* at P 65. Additionally, the Commission "remain[ed] convinced that the benefits" TRANSlink offered "with reductions in rate pancaking and increases in efficiency w[ould] far exceed the increases in access rates that" some customers may have faced. *Id.* Thus, far from holding that removal of depancaking could never be an adverse increase in rates, the Commission held that it lacked enough information to decide the issue, and that certain benefits offered by TRANSLink would offset the alleged increase in rates. *Id.*; *cf. Startrans IO, LLC*, 130 FERC ¶ 61,209 at P 30 (2010) (finding that benefits would offset the rate increase and therefore the rate increase was not deemed adverse); *Silver Merger*, 145 FERC ¶ 61,261 at P 65 (finding no rate increases); *Cent. Vt. Pub. Serv. Co.*, 138 FERC ¶ 61,161 (2012) (finding that because the hold harmless commitments included all transaction-related costs, and nothing in the application indicated a rate increase to those customers, there was no adverse effect on rates).

Because Petitioners' contentions fail and we have previously recognized that "both Municipal Customers and [Petitioners] agree the[re] will be material increases" in rates, *KYMEA*, 45 F.4th at 177, we hold that the Commission properly concluded that removing depancaking protections would adversely increase the rates that Petitioners' Schedule 402 customers would pay if it were not for depancaking. *See Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (treating concession earlier in litigation "as the law of the case").

**2.**

However, upholding the Commission's determination that rates will adversely increase without depancaking is not the end of our analysis. We next decide whether the Commission arbitrarily or capriciously determined that the adverse increase in rates would not be offset or mitigated by benefits or specific ratepayer protections Petitioners offered. *Policy Statement on Hold Harmless Commitments*, 155 FERC ¶ 61,189 at PP 5–6.

Before the Commission, Petitioners argued that depancaking under Schedule 402 provides an undue benefit to Schedule 402 customers that is subsidized by those customers not currently covered by Schedule 402. J.A. 250, 301–02. Petitioners contended that "approximately 80 percent of the costs of depancaking" under Schedule 402 are borne by Petitioners' retail customers. J.A. 250. By ceasing depancaking under Schedule 402, Petitioners contend that their retail customers and Schedule 402 customers would pay equitable costs. J.A. 250.

The Commission rejected Petitioners' arguments concluding that the "undue benefit" Schedule 402 customers receive has been the case since Schedule 402 was implemented, and those customers have since relied on that benefit "to seek out alternative supply arrangements." J.A.

251. The Commission held that instead of receiving a benefit, Schedule 402 customers are "placed in the same position they would have been in had [Petitioners] not withdrawn from MISO." J.A. 251. Moreover, in the Commission's Rehearing Order, it held that the adverse rate increase from removing depancaking under Schedule 402 would fall squarely on current Schedule 402 customers rather than being shared by Petitioners' retail and transmission customers. J.A. 302.

The Commission concluded that none of Petitioners' "arguments warrant[ed] accepting the" Petitioners' proposal to end depancaking under Schedule 402. J.A. 304. First, the Commission was unpersuaded by Petitioners' contention that depancaking under Schedule 402 should cease because, as a matter of policy, the Commission generally sets time limits on mitigation measures. J.A. 1231–32, 304. This argument failed because Petitioners did not meet their burden in proposing a time limit to depancaking under Schedule 402 at the outset in 2019. J.A. 304. Second, the Commission rejected Petitioners' argument that Schedule 402 itself contemplates changes to its requirements because they did not show that the specific changes they were proposing would avoid adverse impacts on rates. J.A. 305, 1232. Third, the Commission declined to engage with Petitioners' argument that depancaking under Schedule 402 "could be limiting competition from" resources from PJM Interconnection L.L.C., another regional transmission organization, thereby diminishing competition in the market, J.A. 1232–33 (emphasis omitted), because our opinion in *KYMEA* only directed the Commission to reconsider its decision to end depancaking based on its effect to customer rates, and not to competition. J.A. 305.

Before us, Petitioners once again contend that their retail customers inequitably "bear the overwhelming majority of the costs that" the customers under Schedule 402 do not have to bear, and that their 1998 merger already eliminated one layer

of pancaked rates between previously separate companies LG&E and KU. Pet'rs' Br. 50–51. Petitioners also argue that "FERC ignored that" the transition mechanism agreements it previously ordered Petitioners to create "provided the ultimate ratepayer protection." Pet'rs' Br. 53; *see also KYMEA*, 45 F.4th at 171, 173. According to Petitioners, "certain power sales and purchase contracts w[ould have] continue[d] to receive depancaked rates for decades" under the transition mechanism agreements. Pet'rs' Br. 54 (emphasis omitted).

The Commission declined to consider the transition mechanism agreements as "ratepayer protections" because it held that the transition mechanism agreements were only "required to protect the reasonable reliance interests of [Schedule 402] customers" and thus were not ratepayer protections. J.A. 303. Further, the Commission found that even if the transition agreements "would reduce or eliminate the rate impact for" some of Petitioners' customers, it would not do so for others. J.A. 303–04. The Commission also disagreed that denying Petitioners' Proposal would force Petitioners to maintain depancaking under Schedule 402 "in perpetuity." J.A. 304 (internal quotations omitted). Petitioners contend that the Commission's holding was arbitrary because the transition mechanism agreements would fully "mitigate any impact on rates from removal of" depancaking under Schedule 402. Pet'rs' Br. 55–56.

Petitioners' latter point is an important one. "[W]e cannot ignore the Commission's unwillingness to address an important challenge." *K N Energy, Inc.*, 968 F.2d at 1303. We are not satisfied that the Commission adequately addressed this important issue—that the transition mechanism agreements would have protected each customer with a reliance interest, Pet'rs' Br. 54, thereby mitigating any concern that customers continue to need Schedule 402 to protect their reliance interests. *See* J.A. 302–03, 1230. In fact, during oral

argument, counsel for FERC suggested that the transition mechanism agreements could be a potential protection offered to mitigate or end the need for depancaking. *See* Oral Arg. Tr. 29:15–30:12.

Instead of grappling with the transition mechanism agreements as ratepayer protections, the Commission held that even if the transition mechanism agreements "reduce[d] or eliminate[d] the rate impact for certain . . . customers, there will still be a rate impact for other customers." J.A. 303–04. However, the Commission's orders do not specify who those customers are and why they are not protected, and thus the Commission's decision is not adequately reasoned. *See Del. Div. of the Pub. Advoc. v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021) (finding the Commission's decision arbitrary and capricious because it "failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before" it (internal quotations omitted)); *see also State Farm*, 463 U.S. at 43.

According to the record, there are eighteen municipalities covered by Schedule 402. J.A. 244, 412. Petitioners contend that twelve of these parties are covered under either the transition mechanism agreements or another agreement. Oral Arg. Tr. 19:19–20. And, the remaining six other parties do not have settlement agreements because they do not take power from MISO. [3] *See* Oral Arg. Tr. 19:20–21, 20:2–3. Therefore, based on the evidence highlighted by Petitioners, there are no Schedule 402 customers remaining who either: (1) do not already have a settlement agreement that can be enforced if approved by FERC or (2) do not rely on depancaking in Schedule 402 because they receive power elsewhere. The Commission should thus conduct its own

---

[3] Petitioners' claim that Falmouth, Bardstown, Nicholasville and three other cities no longer have an interest in MISO because they receive energy elsewhere. *See* Oral Arg. Tr. 22:16–24.

review of the evidence to determine whether there are any Schedule 402 customers who are not already covered by the transition mechanism agreements and are affected by the removal of depancaking. The Commission should then conduct its own review to determine whether the transition mechanism agreements could adequately act as ratepayer protections rather than or in addition to protecting the reliance interests for those customers who are benefiting from Schedule 402. *See Cigar Ass'n of Am. v. FDA*, 126 F.4th 699, 704 (D.C. Cir. 2025) (holding that the agency acted arbitrarily when plaintiffs "provided evidence bearing directly on [the] question" before the agency but it failed to consider the evidence). If Schedule 402 is no longer needed to serve the purpose for which it was meant because all Schedule 402 customers are now either covered by the transition mechanism agreement or no longer rely on depancaking, *see* Oral Arg. Tr. 21:6–9, the Commission may conclude that Schedule 402 is no longer needed to offset the adverse impact on rates. We do not make that determination for the Commission but simply remand the case back to the Commission so that it can weigh the evidence and determine whether the transition mechanism agreements would adequately protect ratepayers. *See United Steel v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) ("[I]n judicial review of agency action, weighing the evidence is not the court's function.").

Because we do not have the authority to "uphold an agency's decision" unless "we can discern a reasoned path from the facts and considerations before the [agency]," we vacate the Commission's orders denying Petitioners' Mitigation Removal Proposal and remand the matter back to the agency to resolve the issue. *K N Energy, Inc.*, 968 F.2d at 1303 (internal quotations omitted); *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (same).

We reiterate that we express no view of what the Commission should conclude upon remand. We merely direct

the Commission to consider who the transition mechanism agreements cover, determine whether there are any other customers currently benefiting from depancaking under Schedule 402 that are not covered by the transition mechanism agreements, and conclude whether any benefits or ratepayer protections would suffice to offset the adverse impact on rates that would occur from ceasing depancaking under Schedule 402.

### C.

Petitioners last contention is that FERC "did not balance," Pet'rs' Br. 57–58, or adequately "balance," Pet'rs' Br. 59–60, the three public interest factors after concluding that removal of depancaking under Schedule 402 would have an adverse effect on rates that was not offset or mitigated. However, the Commission is not required to "balance" the three public interest factors but must simply "consider" them.

In analyzing whether a proposed application is in the public interest under section 203, FERC "generally take[s] into account three factors . . . the effect on competition, the effect on rates, and the effect on regulation." 1996 Merger Policy Statement, 61 Fed. Reg. at 68,596; *see also KYMEA*, 45 F.4th at 167–68; 16 U.S.C. § 824b(a)(4).

Contrary to Petitioners' argument, none of the authority cited by Petitioners mandates the Commission to "balance" the three public interest factors, and we are not aware of any. The 1996 Merger Policy Statement states that "[i]n general, [the Commission] expect[s] that a merger . . . will satisfy each of the three [public interest] factors." 61 Fed. Reg. at 68,597. "However, [the Commission] recognize[s] that there may be unusual circumstances in which" a proposal may not satisfy each public interest factor but still "clearly compel approval." *Id.* "The Commission . . . could, in [that] particular case, conclude that on balance" the proposal is consistent with the

public interest. *Id.* Absent from this Policy Statement is a rule that the Commission *must* balance the three public interest factors. *See also KYMEA*, F.4th at 167 ("In 1996, the Commission announced that it would analyze whether a proposed merger is in the public interest by 'generally' *considering* its effect on three factors—competition, rates, and regulation." (emphasis added)); *see also* 18 C.F.R. § 2.26 ("[T]he Commission will generally *consider* the following factors; it may also *consider* other factors: (1) The effect on competition; [t]he effect on rates; and (3) [t]he effect on regulation." (emphasis added)).

Consistent with its precedent and regulations, the Commission considered each public interest factor after our decision in *KYMEA*. J.A. 305. On remand from this Court, the Commission found that even though removing depancaking under Schedule 402 "was in the public interest when considering the effect on competition," that finding did not "outweigh [the] adverse effect on rates" from the action. J.A. 306 (quoting J.A. 251). The Commission declined to "further analy[ze] . . . the competitive effects of" depancaking under Schedule 402 because of our "focus on the rate impacts of repancaking" in *KYMEA*. J.A. 305. The Commission added that "even if [it did] consider the other [public interest] factors . . . [the Commission would] not [be] convinced that the other elements of the Commission's section 203 analysis would warrant accepting the [Petitioners' proposal] given [the] finding that it w[ould] result in an adverse effect on rates." J.A. 305–06 (explaining that "the absence of negative effects of removing depancaking mitigation . . . on regulation or [competition did] . . . not translate into positive benefits that outweigh the adverse effect on rates." (citation modified)); J.A. 251.

Recognizing that the effect on regulation is not at issue in this case, *see KYMEA*, 45 F.4th at 168, on remand the Commission should consider each prong of its public interest

test, after correcting its rates analysis, to determine whether Petitioners' Proposal to end depancaking under Schedule 402 is in the public interest.

## IV.

In sum, we hold that the Commission lawfully analyzed whether to remove depancaking under Schedule 402 consistent with subsection 203(b) and determined that removal of depancaking under Schedule 402 would adversely affect rates; but it arbitrarily concluded that Petitioners did not provide sufficient ratepayer protections to offset the adverse impact to rates. We vacate and remand the matter back to the Commission so that it can factor ratepayer protections into its analysis and then consider the three public interest factors to determine whether to approve or deny Petitioners' Proposal.

*So ordered.*